ALEXANDER H. LADD v. THE SOUTHERN COTTON PRESS AND
MANUFACTURING COMPANY.

*(Case No. 1812.)*

1. PUBLIC USE — FRANCHISE.— A cotton-press and manufacturing company does not, by virtue of the legislative act incorporating it for the purpose of carrying on a warehousing and cotton compress business, submit its property and services to public use. It is by reason of the nature and character of the business, and not from the fact that it is carried on by an individual or corporation, that the laws hold the property or services of the owner to have been submitted to public use.

2. PUBLIC EMPLOYMENT.— The business of warehousing and compressing cotton is not an employment which the common law declares public.

3. JURIS PUBLICI.— In the absence of a legislative enactment, a business strictly *juris privati* will not become *juris publici* by reason of its magnitude or the number of persons affected by it; the right to control the property invested in it pertains (if to any) to the legislative and not to the judicial department of the government.

4. PUBLIC USE — COMBINATION.— A party who has not subjected his property and services to public use by the character of his business, does not do so by reason of a combination with others in a like business, though he may be enabled thereby to exact from those who may employ him unreasonable and extortionate charges for the services rendered.

5. CASES DISCUSSED.— Munn *v*. Illinois, 4 Otto, 125, discussed.

6. JURIS PUBLICI. — Plaintiff alleged in effect that defendants, who were engaged in the business of receiving, storing, compressing and delivering

cotton, had, without any exclusive right to conduct that business, by combination, virtually acquired its exclusive control in the city of Galveston, which enabled them to extort fictitious charges, and charges without consideration, and thereby to collect toll on nearly all the cotton produced in Texas: *Held* —

1. That in the absence of a legislative act, it did not follow as matter of law that the business was affected with a public use.

2. If the combination was illegal, the parties to it would be subject to such penalties as the law imposes.

3. *Quære,* whether the legislative department can declare a business *juris publici,* if the circumstances under which it is conducted would seem to justify, and the good of society require it, which, in the absence of such an act, would be subject to the laws governing private business, without violating the constitution.

7. CONTRACT. — If payment be made of unreasonable charges, to a cotton compress company, with full knowledge of all the facts and without fraud, deception or duress, the payment cannot be recovered back even as to the amount paid without consideration.

8. PROTEST — UNREASONABLE CHARGES. — A mere protest against a charge does not entitle the party who voluntarily, and without duress or compulsion, pays it, to recover it back.

9. DURESS. — To entitle a party who has paid money, to recover it back on the ground of duress, he must at the time of payment have been under the necessity of either then making the payment, or of resorting to the courts to get possession of the property wrongfully detained, or to recover his liberty, or he must at least show that there was an apparent necessity of resorting to the courts for one or the other of these purposes.

APPEAL from Galveston. Tried below before the Hon. Wm. H. Stewart.

Suit by Alex. K. Ladd, appellant, a cotton buyer, against The Southern Cotton Press and Manufacturing Company, a corporation under the laws of Texas, carrying on the business of receiving, storing and compressing cotton, to recover back certain moneys paid on cotton entrusted to them. The money sought to be recovered back was alleged to have been paid by Ladd for charges on cotton purchased by him, after it had been stored, and while so stored in the warehouses and compress establishments of appellant. The right to recover was claimed on the ground, that, upon the facts stated in the petition, the payments had been made involuntarily, and under

duress; that the charges demanded by the company were unlawful and without consideration; that by reason of the fact set forth, the property and services of the company had been submitted to public use, and had become affected with a public interest; that the charges exacted were oppressive and extortionate, and that they were received under circumstances entitling the plaintiffs paying the same to recover them back.

The petition, after alleging the incorporation of the company, etc., set forth in substance, that almost the entire cotton crop of Texas was shipped to Galveston for sale there, and shipment elsewhere; that the compressing thereof was necessary to its exportation; that large warehouses and compresses to store and compress the same formed a distinct business, requiring a large investment of capital, machinery, etc.; that there were seven warehouses and compress establishments in Galveston, including defendants, doing almost the entire business, which combined together and agreed on the same prices, terms, etc., forming a powerful monopoly, by and through which the cotton trade of Galveston was of necessity done, and having it in their power to exact from all persons engaged in the cotton trade, whatever charges they chose to impose upon such cotton, whether just or not; and that only one small compress in Galveston, doing only an inconsiderable business, was not united in the monopoly.

That these companies were incorporated and chartered by the state of Texas, and acting under their respective charters in performing the business of the public in preparing cotton for exportation, and in the exercise of a public employment and of franchises in which the public had an interest; that at various times from September 1, 1875 (as shown in exhibits), plaintiff purchased from the owners large quantities of cotton in bales, then in the compress and warehouses of defendants, and received orders in writing, commonly called delivery orders, therefor, from the owners, which were presented by plaintiff, and at the same time defendants ordered in writing the delivery of the cotton to other persons or vessels, as shown

in the exhibits, which deliveries they were bound to make at
the compress, without charge therefor, but refused to do so
unless plaintiff would pay certain charges, called *shippers'
charges*, set forth in the exhibits, or would agree to pay the
same in monthly bills, which plaintiff was compelled to do
under fear of incurring expenses and delays ruinous to his
business.

That these charges were not for any labor, care or service in
respect to cotton, but were without consideration on the part of
defendant, except the simple act of delivery at the compress
or warehouse, involving no labor or service whatever, but con-
sisting in merely parting with the possession and control of
the cotton, and permitting plaintiff and his transferees to take
possession and control thereof at the warehouse, etc.; that
these charges were forty, fifty and thirty cents respectively, per
bale, as shown, in which was included fifteen cents per bale for
drayage from the establishment, which was included whether
drayage was done or not; if drayage was done, it was for ac-
count of parties to whom delivery was made, and not for
plaintiff; that such charges in excess of fifteen cents were
utterly without any consideration, unjust, unreasonable, and a
mere tax and imposition on inter-state and foreign commerce,
and in violation of the constitution of the United States.

That the charges complained of were mere arbitrary and
fictitious, imposed by the compress establishments by unlaw-
ful conspiracy, extorted under the necessity of submitting
thereto or being deprived of the privilege of dealing in cotton
in Galveston, or of delays, trouble, litigation and expense in
obtaining possession of their cotton and resisting such charges,
alike destructive of their business; that those making such
exactions knew at the time that the denial of their justice and
legality was public and notorious, and were enforced by the
power of exaction and extortion possessed by the combination,
and submitted to under protest and under necessity and com-
pulsion; that they knew said charges were without considera-
tion and illegal; that they would not permit the removal of

cotton, nor deal with persons refusing to pay or threatening to contest their illegal demands, and held such refusal *in terrorem* over all persons dealing in cotton in Galveston, and compelled compliance with, and submission to, their illegal demands, under pain of impeding and obstructing the subsequent business of those whose occupations required them to deal with cotton in the presses, and their business would have been broken up.

That from the known power, influence and disposition of the combination, contest with them would have fatally injured the credit of cotton buyers, barred them of the usual and necessary facilities for business, and compelled them to abandon the same, all of which was well known to defendants at the time of making and receiving said charges.

The appellee demurred generally and specially, first, that the facts pleaded showed no duress; second, that the business was a private and not a public one.   Demurrer sustained and appeal perfected.

*Ballinger, Jack & Mott* for appellants:

I. There are two points deemed controlling in this case: *First*. That the Cotton Press Company was a chartered company, undertaking and engaged to perform services to the public of a character involving public use, interest and policy in an eminent degree, subject, therefore, to legislative control whenever exercised; or if not exercised, then entitled to charge and receive only reasonable compensation for such services, always to be judicially determined. *Second*. The petition shows that the charges exacted by the company were without consideration, unreasonable, oppressive and extortionate, and that they were received under circumstances entitling the plaintiffs paying the same to recover them back. This subject is presented fully in the Illinois Grain Elevator and Railroad cases, decided in 4th Otto. These were cases of the greatest consideration, argued and reargued, held under long advisement, decided by a court not only of the highest authority in the coun-

try, but by a court not hitherto deemed the friendliest to the rights of the public as against the rights of corporations or monopolies.    They are believed to be decisive of the principles involved in this case, and it is confidently relied that they will receive the cordial approval of this court, and be followed to their rightful results with no unwilling steps.

II.  In support of the same, we refer to the following authorities, viz.:

County of Galveston v. Gorham, Sup. Ct. of Tex., 49 Tex., 279; 1 Tex. L. J., 250;  Maxwell v. Griswold, 10 How., 256; Astley v. Reynolds, 2 Strange, 915;  Morgan v. Palmer, 2 B. & C., 729;  Dow v. Parsons, 2 B. & Ald., 563;  Shaw v. Woodcock, 7 B. & C., 73 (14 E. C. L. R.);  Smith v. Cuff, 6 M. & S., 160;  Duke de Cordoval v. Collins, 4 A. & E., 864 (31 E. C. L. R., 379);  Carter v. Carter, 5 Bing., 406;  same, 37;  Ashmole v. Wainright, 2 Ad. & E., 844 (42 E. C. L. R., 938); Valpy v. Manley, 1 C. B. R., 594 (50 E. C. L. R., 592);  Steele v. Williams, 4 Exch., 624;  Oates v. Hudson, 6 Exch., 346; Goddard v. Bulow, 1 Nott. & McC., 55, 56;  Bates v. N. Y. Ins. Co., 3 Johns. Cas., 241;  Hearsey v. Pruyn, 7 Johns., 181; Ripley v. Gelston, 9 Johns., 201;  Clinton v. Strong, id., 377;  Frye v. Lockwood, 4 Cow., 456;  Joynes v. Third School Dist., 3 Cush., 567;  Northrop v. Graves, 19 Conn., 548; Henry v. Chester, 15 Vt., 460;  Chase v. Dwinal, 7 Greenl., 134.

*Flournoy & Scott* also for appellants.

I. The petition shows that appellees had submitted their property and service to public use:  1. By becoming incorporated by the legislature for the purpose of carrying on the business designated.   2. By virtue of the nature and extent of the business.   3. Because by combination with others in the same line of business, it became a *virtual* monopoly, the exercise of which enabled them to exact fictitious charges and charges without consideration, as a substantial toll on nearly all of the chief commodity of the state, and that thereby their

services and property became affected with a public interest. Constitution of Texas, sec. 4, art. Private Corporations; 1 Hargrave's Law Tracts, 78; 5 How., 583; Munn *v.* Illinois, 4 Otto, 125 *et seq.;* Bolt *v.* Stennett, 8 Term, 606; Aldnutt *v.* Inglis, 12 East, 527.

II. That the charges complained of having been utterly without consideration, and involuntary or enforced payment having been made under protest and without mutuality of assent necessary to a contract, in fact under duress of property and absolute enforcement of the appellants, under all circumstances the amounts so paid are recoverable. Astley *v.* Reynolds, 2 Strange, 915; Oates *v.* Hudson, 6 Exch., 344; 5 E. L. & E., 469; Chase *v.* Dwinal, 7 Greenl., 134, marg.; Crawford *v.* Cato, 22 Ga., 594; Elliot *v.* Swartout, 9 Pet., 138; Foshay *v.* Furgeson, 5 Hill (N. Y.), 158; Collins *v.* Westbury, 2 Bay (S. C.), 211; Saspotas *v.* Jennings, 1 Bay (S. C.), 470; the last three cited with approval by this court in McGowen *v.* Bush, 17 Tex., 201; City of Marshall *v.* Snedeker, 25 Tex., 470. Appellees enjoy a virtual monopoly of the business of warehousing and compressing cotton in Galveston, practically of almost the entire cotton crop of the state of Texas. Their usefulness is recognized in the charter of their incorporation, and their necessity illustrated in the petition of appellants. They stand, as the supreme court of the United States say in Munn *v.* Illinois, 4 Otto, 130, in the "very gateway of commerce" of the chief production and export of the whole state. It is necessary that every bale of cotton produced in Texas and shipped through this city should pay a certain toll to appellees and their confederates. We insist that the public have an interest and a right to regulate the tolls and charges lawfully to be demanded and collected under such circumstances. Not questioning but that every man has the right to make the most of his own or (under ordinary circumstances) to enforce whatever charge he may demand for the use of his own service or property (when due notice has been given and others are free to accept or refuse), so long as it remains in

strictly a private use; but so soon as the circumstances sur-
rounding its use affect it with a public interest; so soon as it
becomes submitted to the use of the public, especially when
its use by the public becomes a commercial necessity, and
clothes it with the elements of virtual monopoly, it ceases
(according to Lord Hale, De Portibus Maris, 1 Harg. Law
Tracts, 78) to be *juris privati* only.   Thereupon the right to
regulate its use becomes of the very essence of government.
"From this source came the police powers, which, as was said
by Chief Justice Taney in the license cases (5 How., 583), ' are
nothing more or less than the powers of government inherent
in every sovereignty.'   Under these powers the government
regulates ' the conduct of its citizens one towards another, and
the manner in which each shall use his own property when
such regulation becomes necessary for the public good.   In
this exercise it has become necessary in England from time
immemorial, and in this country from its first colonization, to
regulate ferries, common carriers, hackmen, bakers, millers,
wharfingers, inn-keepers, etc.,' and in so doing to fix a maxi-
mum of charge to be made for services rendered, accommoda-
tions furnished and articles sold.   To this day statutes are to
be found in many of the states upon all these subjects." Munn
*v.* Illinois, 4 Otto, 125.   "Property does become clothed with
a public interest when used in a manner to make it of public
consequence, and affect the community at large."   As early as
the reign of Charles I, Sir Matthew Hale used the following
language:   "A man for his own private advantage may, in a
port or town, set up a wharf or crane, and may take what rates
he and his customers can agree for cranage, wharfage, house-
lage, pesage, for he doth no more than is lawful for any man
to do, viz.: makes the most of his own.   If the king or a sub-
ject have a public wharf into which all persons that come to
that port must come " (either because of special license or
because it is the only one to which they can come), " in that
case there cannot be taken arbitrary and excessive duties for
cranage, wharfage, pesage, etc., neither can they be enhanced

to an immoderate rate; but the duties must be reasonable and moderate, though settled by the king's license or charter, for now the wharf and crane and other conveniences are affected with a public interest and cease to be *juris privati* only." De Portibus Maris, 78. This doctrine was cited with approval by Lord Kenyon in Bolt *v.* Stennett, 8 Term, 606, and was fully extended and applied by Lord Ellenborough in Aldnutt *v.* Inglis, 12 East, 527. In the last case Lord Ellenborough summed up as follows: "It is enough that there exists in the place and for the commodity in question a virtual monopoly of warehousing for this purpose, on which the principle of law attaches, as laid down by Lord Hale, which includes the good sense as well as the law on the subject. In England — even on the rights of prerogative — they scan his words with as much care as if they had been found in Magna Charta; and the meaning once ascertained they do not trouble themselves to search any farther." 6 Cow. (N. Y.), 536. He was the only judge whom Cromwell persistently importuned to accept office under his administration, and the only one who refused to permit him to interfere with his high duties as judge of the court of common pleas. He defended Lord Strafford in 1640, and Archbishop Laud in 1643, the eleven members of the house of commons in 1647, and was retained as counsel for Charles I and for the Duke of Hamilton. Upon the restoration he became chief baron of the court of exchequer. Munn *v.* Illinois, 4 Otto, 130. The inquiry in that case was answered in the affirmative by ascertaining that the grain elevators at Chicago had the warehousing of most of the grain crop of six or seven states when in transit on its way from the producer to its final market. Astley *v.* Reynolds, 2 Strange, 915, is usually regarded as the leading case on this subject, although it was but the then well understood doctrine of the English courts. There are a large number of cases affirming the doctrine in Astley *v.* Reynolds, and the following have been selected as applicable: Oates *v.* Hudson, 6 Exch., 344, decided in 1857; also found in 5 E. L. & E., 469; Chase *v.* Dwinal,

7 Greenl., 135, marg.; Crawford *v.* Cato, 22 Ga., 594. In this last case the court held there "must be a concurrence of two minds to form a contract. If one party wills that another shall execute a deed or note and refuses to deliver property of the other until he signs such deed or note, there is but a single mind assenting to the contract." We also refer as especially in point, to Elliot *v.* Swartout, 10 Pet., 138; Foshay *v.* Furgeson, 5 Hill (N. Y.), 158; Collins *v.* Westbury, 2 Bay (S. C.), 211; Sasportas *v.* Jennings, 1 Bay (S. C.), 470. The three last are cited with approval by this court as before stated in McGown *v.* Bush, 17 Tex., 201, and the principle contended for, though not necessary to the decision of that case, is very clearly stated by Justice Lipscomb to be correct. It was also decided in that case that plaintiff need not allege insolvency of defendant at time of enforced payment in order to recover. The whole doctrine is substantially reaffirmed by this court in the City of Marshall *v.* Snedeker, 25 Tex., 470.

*Geo. Mason* and *A. R. Cambell* for appellee.

I. The facts set out in petition do not show that appellee had submitted its property or services to public use; such submission being a conclusion of law, which is alleged in petition, but is not supported by the facts therein stated. .

II. If the facts alleged in petition showed that appellee had submitted its property and services to public use, and that its property and services had become affected with a public interest, such submission, and becoming so affected, would not entitle or contribute toward entitling the appellant to the relief prayed for.

III. Where one carries on a business, in which any citizen or association of citizens may lawfully engage without license or privilege granted by the sovereign, and carries on such business exclusively with his own property and means, and does not possess, by reason of the character or situation of his property or otherwise, peculiar or unusual or exclusive facilities, or advantages, for carrying on such business, not accessible to

others who are willing to invest the requisite energy, enterprise and industry, the property and services employed in such business are not thereby submitted to public use, or affected with a public interest.

IV. To constitute a business in the nature of a public employment, affecting a submission of property and service to public use, or affecting such property and services with a public interest, it must be, either: 1. A business that can only be lawfully carried on under a privilege granted by the sovereign, as in the case of a ferry; or, 2. A business that involves an unusual use of public property, as in the case of common carriers, whose business can only be conducted by using the public highways; or, 3. A business that has had impressed upon it by ancient, established and settled rules of law, the character of a public employment, as in the case of a miller; or (as has been lately claimed, though probably without sufficient reason), 4. A business belonging to neither of the above classes, but upon which the legislative department has undertaken to impress a public character, and to impose special regulations and restrictions, as in the case of a grain elevator in the state of Illinois.

V. To constitute a monopoly, there must be an exclusion by the power of government of all persons except the monopolist from the business monopolized. To constitute " a virtual monopoly" (if any legal meaning can be attached to the term) there must be a similar exclusion, by means of peculiar advantages or facilities possessed by the monopolist and not susceptible of being acquired by others having equal or superior capital. Hence, there can be no monopoly or " virtual monopoly " of any business which is lawfully and in fact open to the competition of all who have sufficient capital to engage in it. 7 Bacon's Abridgment, title Monopoly, 22, 23; Allnutt *v.* Inglis, 12 East, 540.

VI. The business of appellee, so far as it was connected with any matter in controversy in this suit, was that of receiving, storing, keeping — and of necessity *delivering* — the cot-

ton of such persons as choose to employ its services, upon terms, conditions and charges which were uniformly and notoriously imposed and exacted for such services, and such business was an employment in which all persons of common right might engage.  Southern Steamship Co. *v.* Sparks, 22 Tex., 659; 1 Parsons on Contracts, 618–622;  Story on Bailment, §§ 444–450;  Edwards on Bailment, 284, 296.

VII. Appellee being incorporated for the purpose of carrying on the business stated in the petition, the necessary legal conclusion is that the corporation so created had power to contract and be contracted with in respect to all matters necessarily involved in transacting such business, including contracts for receiving, storing, keeping and *delivering* cotton, there being no fact stated in the petition showing any limitation imposed by the act of incorporation on such power of contracting. Angell & Ames on Corporations, § 110.

VIII. The combination, as alleged in petition, of appellee, with others engaged in like business, by which they agreed to demand and collect the charges complained of, on all cotton stored with them, was not unlawful.  And every one storing cotton with appellee, with knowledge of such agreement, and that such charges are uniformly demanded and collected by appellee, on all cotton stored with it, thereby assents to such charges and subjects such cotton thereto, and any person afterwards purchasing such cotton takes it subject to such charges. Southern Steamship Co. *v.* Sparks, 22 Tex., 659; Kirkman *v.* Shawcross, 6 Term, 17, 18, 19.

IX. The payments, by appellant, of the charges sought to be recovered back, were not involuntary and were not made under duress.    Southern Steamship Co. *v.* Sparks, 22 Tex., 659; Kirkman *v.* Shawcross, 6 Term, 17, 18, 19;  Radish *v.* Hutchins, 5 Otto, 212, 213, and cases there cited; Fleetwood *v.* City of N. Y., 2 Sandf. (N. Y.), 475; Kenneth *v.* South Carolina R. R. Co., 15 Rich. (S. C.), 284; Mayor of Baltimore *v.* Lefferman, 4 Gill (Md.), 425; Lester *v.* Mayor of Baltimore, 29 Md., 415; Awalt *v.* Eutaw Building Association, 34 Md.,

435; Potomac Coal Co. v. Cumberland & Pennsylvania R. R. Co., 38 Md., 226; Cook v. Boston, 9 Allen (Mass.), 393; Detroit v. Martin, 34 Mich., 170; Town Council of Cahaba v. Burnett, 34 Ala., 404–409.

X. Payments made under no mistake of facts, and where no deception or fraud is practiced, are not involuntary or under duress, unless the party so paying is, at the time of such payment, reduced to the necessity of either then making such payment, or of resorting to the courts in order to recover property then detained, or to recover liberty then restrained; or unless the party demanding such payment has the power, and manifests the intention of immediately using it, to reduce the party upon whom the demand is made to such necessity. Mayor, etc., of Baltimore v. Lefferman, 4 Gill (Md.), 425; Brumagim v. Tillinghast, 18 Cal., 265; Mays v. Cinncinnati, 1 Ohio St., 268; Awalt v. Eutaw Building Association, 34 Md., 436; Lester v. Mayor of Baltimore, 29 Md., 415; Cook v. City of Boston, 9 Allen (Mass.), 393; Fleetwood v. City of N. Y., 2 Sandf. (N. Y.), 475; Fellows v. School District, 39 Me., 559; Elston et al. v. City of Chicago, 40 Ill., 519; Radish v. Hutchins, 5 Otto, 212, 213; Town Council of Cahaba v. Burnett, 34 Ala., 405; Detroit v. Martin, 34 Mich., 170; Benson v. Monroe, 7 Cush. (Mass.), 125; Flower, etc., v. Lance, etc., 59 N. Y., 603; Kansas Pacific R. W. Co. v. Wyandotte Co., 16 Kan., 587.

XI. A payment made under protest does not become involuntary, or under duress, by reason of such protest. Fleetwood v. City of N. Y., 2 Sandf. (N. Y.), 475; Flower, etc., v. Lance, etc., 59 N. Y., 603; Forbes v. Appleton, 5 Cush. (Mass.), 115; Benson v. Monroe, 7 Cush. (Mass.), 125; Cook v. Boston, 9 Allen (Mass.), 393; Emmons v. Scudder, 115 Mass., 367; Lester v. Mayor of Baltimore, 29 Md., 415; Awalt v. Eutaw Building Association, 34 Md., 435; Mayor, etc., v. Lefferman, 4 Gill (Md.), 425; Patterson v. Cox, 25 Ind., 261; McMillan v. Richards, 9 Cal., 365; Bucknoll v. Story, 46 Cal., 589; Phillips v. Jefferson Co., 5 Kan., 412; Kansas Pacific R. W. Co. v.

Wyandotte Co., 16 Kan., 587; Detroit *v.* Martin, 34 Mich., 170.

*Mann & Baker* also for appellee. — The petition shows appellee is a private corporation, under general incorporation law, whose only franchise is the attribute of individuality. 2 Pasch. Dig., art. 5932 *et seq.* The legal rights and duties of appellee are the same; no more, no less, than of any individual who uses his property for warehousing for pay. 11 Pet., 629. Warehousing is not one of the employments public at common law, nor has it been restricted by the statutes of this state. Warehousing is not a franchise, but is open to all for mutual gain. 2 Parsons on Contracts, 139, marg.; Story on Bailment, 8th ed., 5442; 4 Otto, 154; 69 Ill., 100. The petition shows business of appellee, as to the charge sought to be recovered, to be warehousing and only doing business for those who would pay, or agree to pay this charge. Combination, making a virtual monopoly, is not a cause of action for recovery of charges paid to one of the parties combining. Nor can courts on this ground go into the question of consideration *vel non* of charges so paid. 34 Ala., 405. Monopoly in its obnoxious common law sense, is the limiting to some, what was before of common right to all, and applies only to legislative action. 4 Blackstone Commentaries, title Monopoly, 160, marg.; Bill of Rights of Texas, sec. 26. The charge complained of is not a toll. A charge made by one in a private business is not a toll. Toll is a charge made in a public employment, and is based on the obligation to do business for all who apply. Comyn's Dig., title Toll; 3 Cruise's Dig., 4th Am. ed., 304, title Franchise, sec. 90. No duress of property as no allegation in petition that at date of payments sought to be recovered, appellee had the cotton of appellant in its warehouse. Appellants could get their cotton on agreeing to pay, according to custom, on first of next month. Whole petition shows that appellants only feared there would be duress if they refused to promise to pay. No compulsion at time of pay·

ment to emancipate the property from existing duress. Radish *v.* Hutchins, 5 Otto, 213, and authorities therein cited; Brown *v.* Pierce, 7 Wall., 214; Baker *v.* Murton, 12 Wall., 158. A warehouseman may make what contract he pleases as to his charges, and one who knowing an invariable and customary charge, buys an article stored subject to this charge, impliedly contracts to pay. Southern Steamship Company *v.* Sparks, 22 Tex., 659; Shepardson *v.* Cary, 29 Wis., 34. There can be no public interest in use of private property, unless there is a blending of private investment on a public work. The public have then an interest in the use, co-extensive with, and as consideration for, the franchise permission so to employ the property, and no further. The State *v.* Southern Pacific Railroad, 24 Tex., 124; B. B. B. & Co. R. R. *v.* Ferris, 26 Tex., 598; Watkins *v.* Walker, 18 Tex., 589. Payment made where the facts do not constitute duress, cannot be recovered though without consideration or illegal. The day in court which party could have had to control validity of the charge by refusing payment, is lost by the payment. Town Council of Cahaba *v.* Burnett, 34 Ala., 405.

MOORE, CHIEF JUSTICE. — This suit was brought in the district court of Galveston county, August 3, 1877, by Alexander H. Ladd, the appellant, against appellee, The Southern Cotton Press and Manufacturing Company, a corporation under the laws of Texas, carrying on the business of receiving, storing and compressing cotton for such parties as might employ its services in that behalf, to recover back moneys alleged to have been paid by appellant at various times for charges which were uniformly and notoriously demanded and collected by appellee on all cotton entrusted to it.

The right to recover back the money thus paid, is claimed in the petition on the ground that upon the facts stated therein the property and services of appellee had been submitted to public use and had become affected with a public interest; that the charges demanded by appellee were unlaw-

ful and without consideration, and that the payments had been made involuntarily and under duress.

The appellee demurred generally and specially, that the facts stated in the petition showed that the business carried on by appellee was a private enterprise and occupation, and not a public employment; that it appeared from the petition that the alleged payments had not been made involuntarily or under duress; that the matters relied on to show duress were insufficient and too vaguely pleaded, and that it appeared from the petition that a large portion of the demand sued for was barred by the statute of limitations.

The demurrer was sustained, and appellant declining to amend, judgment was rendered for appellee. From this judgment an appeal was prosecuted, and appellants assign as error that the court should have overruled, instead of sustaining the demurrer to his petition. In support of this assignment, his counsel make in their brief these propositions, viz.:

*First.* The petition shows that appellee had submitted its property and services to public use.

1. By becoming incorporated by the legislature for the purpose of carrying on the business designated.

2. By virtue of the nature and extent of the business.

3. Because by combination with others in the same line of business, it became a *virtual* monopoly, the exercise of which enabled them to exact fictitious charges, and charges without consideration, as a substantial toll on nearly all of the chief commodity of the state, and thereby its services and property became affected with a public interest.

*Second.* That the charges complained of having been utterly without consideration, and involuntary or enforced payment having been made under protest and without mutuality of assent necessary to a contract, were in fact made under duress of property.

Are these propositions, or any one of them, applicable to the facts averred in appellant's petition, and if so, should the judg-

ment be reversed? We will consider them in the order in which they are presented.

1. Did appellee, by becoming incorporated by the legislature for the purpose of carrying on a warehouse and compress business, submit its property and services to public use? We are cited to no authority tending to support this proposition, and we are unable to perceive any principle or reason upon which it can be maintained. The petition shows that appellee is a mere private corporation, with no privilege or franchise beyond that of carrying on in a corporate capacity the business in which it is engaged. It is by reason of the nature and character of the business, and not from the fact that it is carried on by an individual or corporation, that the law holds that the property or services of the owner have been submitted to public use.

2. The business of warehousing and compressing cotton, is free to every one who wishes to engage in it. No grant or franchise need be obtained from the state to authorize those desiring to do so to embark in this character of business. It is not one of the employments which the common law declares public. (Coggs v. Barnard, 2 Ld. Raym.; 2 Pars. on Con., 139; Story on Bail., sec. 442.) Nor is it claimed to have been made so by statute. And we know of no authority, and none has been shown us, for saying that a business strictly *juris privati* will become *juris publici*, merely by reason of its extent. If the magnitude of a particular business is such, and the persons affected by it so numerous, that the interest of society demands that the rules and principles applicable to public employments should be applied to it, this would have to be done by the legislature (if not restrained from doing so by the constitution) before a demand for such an use could be enforced by the courts.

If the right to regulate property and the character of its employment is, by reason of its extent, and the number of persons interested in or affected by the manner or circumstances

of its use, as counsel for appellant forcibly declares, "of the very essence of government," the exercise of this right or power pertains to the legislative and not the judicial department.

3. Evidently appellant does not intend to assert that appellee, by combination with others engaged in like business, acquired a monopoly or "*virtual* monopoly" of the character declared by the constitution of the state to be "contrary to the genius of a free government," and never to be allowed. (Art. 1, sec. 26.) But the import of his proposition, as we understand it, is that appellee and others engaged in the same business, though this business was a legitimate and lawful one, had, without any exclusive right to conduct it, by combination virtually acquired the exclusive control of the business in the city and port of Galveston, which enabled them "to exact fictitious charges and charges without consideration," and thereby to collect "toll on nearly all the chief commodity of the state." And that by reason of this fact the property and service employed in such business became affected with a public interest. But conceding the premises, the conclusion sought to be deduced seems to us to be a *non sequiter.*

It will readily be admitted that in many instances combinations may be made by parties engaged in a particular trade, or by those who, at the time, have the control of the market for some article of prime necessity, to make most unconceivable exactions for their services or demand a most extortionate price for their commodities. But certainly this does not change the nature of the employment in which they are engaged, or authorize the court to say, when the business of the parties is strictly private, that it has become public. If the combination is illegal, the parties to it will subject themselves to such penalties as the law imposes; and if the injury to society to be apprehended from such combinations is of a character demanding it, the legislature may, by adequate provision, regulate or prohibit persons from engaging in them. Nor do we say that there may not be instances where, by combination, or even

without it, some particular business, by reason of its extent and magnitude and the great number of persons affected by it, though strictly *privati juris* under the common law and previous statutes, which may be declared *publici juris* by the legislature. This seems in effect what was held by the supreme court of the United States to have been done by the legislature of Illinois (4 Otto, 125). But as this is not the character of this case, we are not called upon to express an authoritative opinion on the point. It is sufficient for us to say that in the absence of legislation to that effect, a party who has not subjected his property and services to public use by the character of the business in which he is engaged, does not do so by reason of combination with others in a like business, though he is enabled thereby to exact from those who may employ him unreasonable and extortionate charges for the services rendered. Whether payments made under such circumstances may not be held to have been paid under duress, is another question to be considered hereafter. Nor can it justly be held that the mere extent and magnitude of the business changes a private charge for services into a toll to be regulated by law. Nor if so, that the court may, in the absence of legislation upon the subject, substitute its judgment as to the proper amount of such toll for the contract of the parties.

But although none of the grounds urged by appellant in support of his proposition, " that appellees had submitted its property and services to public use," taken severally and of themselves warrant his conclusion, a fair consideration of the argument of his counsel requires us to consider the effect, not only of each of the positions, standing alone, upon the business of appellee, but also their effect in the aggregate, in connection with all the facts and circumstances connected with or relating to the business in which appellee was engaged and the manner in which it was conducted and carried on.

In doing this it must be conceded, as alleged in appellant's petition, that appellee and those engaged in the same business at the port of Galveston, with the exception of one small es-

tablishment capable of doing but a limited business, had combined and fixed the charges complained of; that the business in which appellee and his confederates were engaged was necessary to the public, in reference to the transit of cotton from the producer to the manufacturer and consumer; that the charges complained of were a common charge against all comers and upon every bale of cotton, and was also a charge demanded and enforced without consideration, a compliance with which was, under the circumstances, essential to the business life of, and the only escape from business ruin by all who follow the business of brokerage in cotton in the city of Galveston.

Now, giving the fullest scope and import to these and other allegations made in the petition, how is it shown that appellee's business is of a character with which the courts of the country have the right to interfere; or from what source, we ask, do they derive their authority to regulate the conditions and terms upon which it shall be conducted? It is not contended by appellant, that, as ordinarily conducted, the business of receiving, storing, compressing and delivering cotton is *privati juris*, which those engaged in it have not the right to fix the rates and conditions upon which it will be conducted. But the argument seems to be, that, in view of the necessities of trade, its magnitude and effect upon the interest of the people throughout the state, as well as of those engaged in the business of appellant, it has become of like public interest as other occupations and trades which the law pronounces and holds to be *juris publici*. The conclusion sought to be maintained rests upon the hypothesis that whenever it is made to appear that any particular business is of so general public interest as that which the law holds to be *juris publici*, the courts have the power to so declare and hold it. The case of Munn *v.* Illinois, 4 Otto, 125, seems to be the authority mainly relied on to support this position. We cannot regard this case as authority for such a doctrine. It was brought to enforce the statute law of the state. The conclusion to be

drawn from it is, as we think, that the legislature may declare a particular business *publici juris,* if the facts and circumstances under which it is conducted justifies and the good of society requires it; but not that the court may so treat it in advance of legislative recognition or declaration. Whether this may be done, even by the legislature, without infringing upon the constitution, need not now be considered. Neither is it necessary for us at present to determine whether the submission of property and service to public use (as there is high authority for holding) is solely dependent upon the fact that those engaged in such business enjoy some franchise, privilege or immunity from the state, or did so in the early days of the common law when this character was impressed upon their property or service. (Dissenting opinion of Fields, J., in Munn *v.* Illinois, *supra,* and authorities cited.)

But if it is admitted that appellee's property and services were affected with a public interest, and the amount demanded of, and paid by appellant, was greater than what was reasonable, as it appears from the petition that the payments were made with full knowledge of all the facts and without fraud or deception, unless made under duress, the amount thus paid cannot be recovered back, although so much as exceeds the reasonable value of the services rendered was paid without consideration. (34 Ala., 405; 7 Cush., 125; 59 N. Y., 603; 50 Ga., 304.)

A mere protest against a charge does not entitle the party who voluntarily and without duress or compulsion pays it, to sue for and recover it back. (5 Cush., 115; 29 Md., 415; 25 Ind., 261; 46 Cal., 589; 5 Kan., 412.)

*Second.* It remains to inquire whether the money sued for was paid without consideration, involuntarily and under duress. There is no pretense of duress except by reason of the alleged combination of appellee and its confederates, to charge a larger amount than the services rendered were reasonably worth; and for the delivery of cotton which appellant says was not in fact actually delivered, and the agreement between appellee and its

confederates that they would not do business with any parties who should fail or refuse to pay any of their charges, or who should resort to the courts to controvert or dispute them. As the business in which appellee is engaged is open to all who wished to engage in it, and was not, as we have seen, affected with a public interest, any one engaging in it may prescribe the terms upon which he will transact it. All parties employing his services, knowing his terms, would be bound by them. If it is lawful for a single individual engaged in other business to prescribe the terms upon which he will conduct it, we do not see how it can become unlawful by others in the same employment agreeing with him that they will also transact their business upon the same terms and conditions. (Kirkman v. Walker, 6 Term, 14.)

If appellee may lawfully decline doing business for or with those who refuse to comply with the terms which it prescribes, the fact that a failure to conform to these terms would result in its declining in future to transact business with the party thus failing, cannot be held to be duress. On the other hand, if the terms and conditions are illegal and such as a party has no right to prescribe for himself or in combination with all parties engaged in like business, thereby securing a *virtual* monopoly, we can see no better reason for saying in this than in the other case that contracts entered into and business conducted for a series of years with one of the parties to such agreement with knowledge of it, can be held to have been under duress. If the combination is illegal and the terms prescribed by it are such as the parties have no right to demand, certainly the courts are not impotent to restrain the parties to such illegal combinations and give redress to those improperly affected by it. To entitle a party voluntarily paying money to recover it back on the ground of duress, he must, at the time of such payment, be under the necessity of either then making the payment, or of resorting to the courts to get possession of property wrongfully detained, or to recover his liberty, or at least show that there is an apparent necessity

13

for resorting to the courts for one or the other of these purposes.

The petition shows that the transactions between the parties to this suit do not come within either of these categories. Appellant certainly had ample time and opportunity to have had his day in court, before the business between him and appellee was closed by the last voluntary payment made by him. Not having complained until the late date at which this suit was brought, he cannot now be heard to complain. (5 Otto, 112–13; 4 Gill (Md.), 425; 1 Ohio St., 268; 34 Md., 436; 115 Mass., 367.)

The judgment is affirmed.

AFFIRMED.

[Opinion delivered March 26, 1880.]