CITY OF AUSTIN, Appellant,

v.

Emile JAMAIL, Appellee.

No. 13789.

Court of Appeals of Texas, Austin.

Dec. 7, 1983.

Rehearing Denied Jan. 11, 1984.

Albert De La Rosa, City Atty., James M. Nias, Asst. City Atty., Austin, for appellant.

John C. Meinrath, McKnight, Herrington & Meinrath, Austin, for appellee.

Before SHANNON, POWERS and BRADY, JJ.

BRADY, Justice.

After hearing, the district court of Travis County dissolved the City of Austin's temporary injunction, enjoining appellee from developing his land on the Lake Austin watershed within the City of Austin's extraterritorial jurisdiction. The court also denied appellant City of Austin a permanent injunction, which would have required appellee to comply with City of Austin Ordinance No. 800103–N before further developing his land. The trial court held, in effect, that the City of Austin has no authority to enforce this ordinance within its five-mile extraterritorial jurisdiction.[1]

Appellant's point of error asserts that the City of Austin has the statutory authority to enforce Austin City Ordinance No. 800103–N, the "Lake Austin Watershed Site Development Ordinance,"[2] within its extraterritorial jurisdiction. We agree that the city does possess such authority and accordingly, we reverse the judgment of the trial court.

Appellee relies on *City of West Lake Hills v. Westwood, Etc.,* 598 S.W.2d 681 (Tex.Civ. App.1980, no writ), as authority for the proposition that a city has no power to enforce any provision of Tex.Water Code Ann. § 26.177 (Supp.1982) in its extraterritorial jurisdiction. The facts in *West Lake,* however, are distinguishable from the case at bar, and do not control the disposition of this appeal.

In *West Lake, supra,* the Waco court reviewed an ordinance of the City of West Lake Hills which prohibited the use of private sewage facilities within the city limits and extraterritorial jurisdiction of the city without a license issued by the city. Violation was made a criminal offense. To obtain a license, the owner had to apply for a license, and the private sewage facilities were required to satisfy certain operational and construction standards. The Court affirmed the judgment of the district court which enjoined the city from enforcing the ordinance against owners of private sewage facilities located outside the city limits. The Court held that § 26.177 did not autho-

1. We note that no statement of facts was included in the record of this case; however, the transcript is sufficient for this Court to decide the issue of extraterritorial jurisdiction. A brief summary of the proceedings at the trial court is as follows: On December 2, 1980, the City of Austin obtained a temporary restraining order preventing appellee from further developing his multi-family building project. An "Agreed Order of Temporary Injunction" was issued December 9, 1980. After a final hearing on November 18, 1981, the trial court concluded that the City of Austin had no authority to enforce Ordinance No. 800103–N outside its city limits, as set forth in its judgment signed June 1, 1982.

2. This ordinance requires anyone building a structure (provided there is only one structure per legal lot other than a single-family dwelling or a duplex) to obtain a "Site Development Permit" before construction or clearing of the land begins. In order to minimize the amount of urban runoff on a lot, the ordinance specifies the amount and slope of impervious surfaces, the amount of pre-construction clearing so as not to affect natural ground cover, the depth of fill material allowed, building foundation standards, and erosion control requirements. The building plan must comply with these requirements set out in the ordinance and must be approved by the city before the permit will be issued. To insure compliance with the terms of the permit and the approved construction plans, the ordinance prohibits the connection of city utilities to the construction site until the city department of engineering has issued a certificate of occupancy when the development is completed pursuant to the requirements of the ordinance.

rize cities to require licenses for the operation of private sewage facilities in their extraterritorial jurisdictions, or to enforce such requirements by penal sanctions. The Court noted that there might be some merit to the argument that the city possessed such authority had § 26.177 been the only statutory provision relating to pollution control. However, the Court noted that Tex.Water Code Ann. § 26.031 and § 26.032 authorized the *Texas Water Commission* to license private sewage facilities, to delegate this authority to cities, and authorized the county commissioners courts to license such facilities, with the proviso that county rules must be approved by the Commission and that Commission rules were to govern in the event of a conflict. The Court noted that § 26.177, if construed to authorize cities to license private sewage facilities, would conflict with these statutes which give the Commission control over these matters. The Court further noted that the Commission's authority to delegate the licensing power to cities under § 26.031 would be superfluous if cities already possessed such power under § 26.177. The Court held that it was required to give effect to the § 26.031 authorization because § 26.031 was more specific than § 26.177, and to do this the court was required to hold that § 26.177 did not confer this authority. The Court continued:

> In our opinion it is clear that the Legislature intended to reserve to the State the ultimate power to regulate in the area of pollution control. . . . Even though the cities may assist in obtaining compliance with pollution standards, these efforts must be in cooperation with the Texas Department of Water Resources. Sec. 26.177(b)(4). Although the Legislature recognized the importance of cooperative efforts between state and local governmental bodies, the state is assigned responsibility for promulgating rules and regulations to control pollution problems. Sec. 26.177 lists five specific functions and services that are or may be assigned to the cities. None of these functions and services specifically requires passage of rules and regulations for controlling

pollution. Instead, the functions and services listed in § 26.177 are in the nature of 'information gathering' functions which would utimately be very valuable to assist the state in designing and in enforcing its rules and regulations. . . . However, the legislative scheme simply *does not contemplate independent regulatory action by a city.* 598 S.W.2d at 686.

This language characterizes the functions of cities under § 26.177 as mere "information gathering" functions, and denies that § 26.177 creates *any regulatory* authority in the city. This language is broad enough to embrace subsection five, since the opinion refers to the "five specific functions" listed in § 26.177. However, this language is quite clearly dictum to the extent that it purports to define the scope of city authority under subsection five because only subsections one through four could possibly have conferred the authority on the City of West Lake Hills to license private sewage facilities outside its city limits.

The City of Austin bases its authority to regulate development of the Lake Austin watershed within its five-mile extraterritorial jurisdiction on Tex.Water Code Ann. § 26.177(b)(5) (Supp.1982) (hereinafter referred to as subsection 5). Subsection 5, unlike subsections 1–4, requires cities with more than 5,000 people to develop and *execute* plans for controlling generalized waste discharges "not traceable to a specific source, such as storm sewer discharges and urban runoff from rainwater." These plans must include the city proper and may include a city's extraterritorial jurisdiction.

Developing and *executing* plans for *controlling* urban runoff under subsection 5 involves more than performing the functions set out in subsections 1–4, which include inventorying discharge points, monitoring waste, collecting water samples, and cooperating with the Department of Water Resources regarding enforcement. Only in subsection 5 does the word "execute" appear. This word means "to make; to perform; to do; to follow out." *Glover v. American Mortgage Corp.,* 94 S.W.2d 1235, 1236 (Tex.Civ.App.1936, no writ). Formu-

lating a plan to control urban runoff on the Lake Austin watershed would be meaningless without any enforcement powers to insure compliance. The legislature left the execution of plans to control urban runoff to the cities since subsection 5 is the *only* statutory provision pertaining to the control of urban runoff, and construction of this provision to authorize cities to regulate development in their extraterritorial jurisdiction *would not,* as in *West Lake Hills,* conflict with any other statutory provisions, dealing more *specifically* with control of urban runoff or the regulation of development in areas outside city limits, or deprive them of their effect. Local governments are in a better position to address the problem of urban runoff for they are most familiar with local growth patterns, local terrain, and their master plans of development. Urban runoff is a result of the interaction of local terrain and urban development patterns.

The term "urban runoff," as used in § 26.177(b)(5) (Supp.1982), is not defined in the Water Code. The term "runoff," however, is defined by Tex.Water Code Ann. § 46.013, Sec. 3.01(n) (Supp.1982) as "both the portion of precipitation which runs off the surface of a drainage area and that portion of the precipitation that enters the streams after passing through the portions of the earth." [3] This type of generalized discharge should be compared with particularized discharge from a specific point source, such as a private sewage facility. A point source is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants or wastes are or may be discharged into or adjacent to any water in the state." Tex.Water Code Ann. § 26.001(21) (Supp.1982). *Accord* 40 C.F.R. § 401.11 (1983) (federal definition of point source is essentially the same as Texas'). Rainwater flowing down a watershed is anything but particularized, as it flows everywhere. The monitoring of this type of pollution (e.g., dust and dirt, street refuse, construction wastes, industrial and vehicle emissions, asbestos from brake linings, petroleum emulsions sprayed on unpaved roads, household trash, plant litter, animal fecal material, fertilizers, pesticides, and herbicides) carried by this type of generalized flow and tracing it to a particular source is obviously impossible, for these pollutants are everywhere. These are the by-products of urbanization. [4]

■ A city must have express (or implied when such power is reasonably incident to those expressly granted) statutory authority to exercise its extraterritorial power. *City of Sweetwater v. Hammer,* 259 S.W. 191 (Tex.Civ.App.1924, error dism'd). The City of Austin's extraterritorial jurisdiction extends for five miles. Tex.Rev.Civ.Stat.Ann. art. 970a § 3(A)(5) (1963). This Court views Texas Water Code

---

3. This definition of runoff is found in the Red River Compact, an agreement among the States of Texas, Louisiana, Arkansas, and Oklahoma. While Chapter 46, the River Compact Chapter, does not deal exclusively with water quality, as does Chapter 26, it is helpful in defining runoff.

The Supreme Court of Georgia has discussed the effect of urban runoff, but without defining it. "[S]iltation and urban runoff threaten[ ] [the] water supplies." *Pope v. City of Atlanta,* 240 Ga. 177, 240 S.E.2d 241, 244 (1977). *Accord Estuary Properties, Inc. v. Askew,* 381 So.2d 1126 (Fla.Dist.Ct.App.1979); *Pedersen v. Washington State Dept. of Transportation,* 25 Wash.App. 781, 611 P.2d 1293 (1980).

4. *See* S. Grava, Urban Planning Aspects of Water Pollution Control (1969).

"[D]istinctions have to be made among domestic sewage, various industrial effluents, and a number of other pollutant sources which have become critical recently, such as *street wash-off,* inorganic fertilizers, and thermal discharges." *Id.* at 31 (emphasis added).

"[R]ecent tests have shown that run-off which has washed city streets, especially after a long dry spell, can be just as offensive as sanitary sewage." *Id.* at 44.

*See also* Wall, *The Lake That Austin Built,* Third Coast, October 1983, at 54 for an informative discussion of the history of Lake Austin in general and the problem of urban runoff pollution of Lake Austin in particular.

Ann. § 26.177(b) as expressly providing the City of Austin with authority to execute its Lake Austin Watershed Site Development Ordinance, to wit: "The water pollution control and abatement program *of a city* shall encompass the entire city and *may include areas within its extraterritorial jurisdiction* which in the judgment of the city should be included to enable the city to achieve the objectives of the city for the area within its territorial jurisdiction." (emphasis added).

The judgment of the district court is reversed. We may not render judgment permanently enjoining appellee from developing his land in violation of the ordinance, because the requirements of the ordinance may be inapplicable to appellee for a reason *other* than that stated in the district court's judgment. We therefore remand to the district court for a new trial.