**CITY OF LUBBOCK, Appellant,**

v.

**PHILLIPS PETROLEUM COMPANY and Texas Pipeline Company, Appellees.**

**No. 07–00–0006–CV.**

Court of Appeals of Texas, Amarillo.

Oct. 24, 2000.

Anita Burgess, City Atty., Lubbock, for appellant.

Thompson & Knight (Debora B. Alsup), Austin, (Michael R. Berry), Dallas, Boerner & Dennis (Don C. Dennis), Lubbock, for appellee.

Before BOYD, C.J., and QUINN and REAVIS, JJ.

BOYD, Chief Justice.

This appeal involves the validity of a pipeline easement granted by appellant

City of Lubbock (the City) to the Texas Pipeline Company some 50 years ago. In the appeal, the City challenges a summary judgment in favor of appellees, Texas Pipeline Company as well as Phillips Petroleum Company and Shamrock Pipeline Company, who are also involved in the operation of the pipeline constructed on the easement. In pursuing its challenge, the City presents five issues for our determination. Four of those issues concern the validity of the easement and the fifth concerns whether the City is estopped from challenging the validity of the easement. Finding the easement to be valid, we affirm the judgment of the trial court.

## History

In 1948, the City purchased a tract of land north of its city limits apparently for the purpose of increasing its water supply by drilling additional water wells on the property. The portions of the tract not utilized by the City were leased for agricultural use. The tract is referred to by the parties as the Larson property. In 1955, Texas Pipeline Company sought to build an underground petroleum line from Abernathy to terminal facilities in the City jointly owned by it and Phillips Petroleum. The proposed pipeline, some 20 miles in length, crossed the Larson property.

On May 27, 1955, in response to a request from Texas Pipeline, the Lubbock City Commission adopted a resolution authorizing the granting of an easement for the pipeline. For a consideration of $332, the City granted an easement to Texas Pipeline, giving it the right to "construct, operate, replace and remove" a pipeline across the Larson property. The Pipeline Company was also granted the right to construct an additional line across the property for an additional $332. The easement provided that it would continue for "so long as such pipe lines … are main-

tained." Working together, in October 1955, Texas Pipeline and Phillips completed construction of a six-inch pipeline. Before the line was completed, the pipeline parties contracted with Diamond Shamrock to operate the line. The surface of the Larson property continued to be used for agricultural purposes.

Three years later, the property covered by the easement was annexed by the City and, in the mid–1960's, was dedicated as a city park. In December 1979, a city crew was digging near the line and damaged it, resulting in a loss of gasoline. The following December, Phillips and Texas Pipeline filed suit against the City alleging it was guilty of negligence, gross negligence, and trespass and sought recovery of $25,248 for repairs to the line and for lost gasoline.

The date that citation was served upon the City is not shown in the record, but it does contain the City's first amended answer and counterclaims, which was filed in 1986. In that instrument, the City challenged the validity of its grant of the 1955 easement, labeled the plaintiffs' use of the property a trespass, and sought recovery of damages totaling $253,793. In 1987, the City added Diamond Shamrock as a third party defendant. For convenience, in this opinion we will refer to Phillips, Texas Pipeline and Diamond Shamrock as the Pipeline Companies.

In 1993, approximately 12 years after the initial suit was filed, the City sought a summary judgment that the Pipeline Companies were liable on the City's counterclaims. The Pipeline Companies then filed a motion seeking summary judgment in their favor. After a hearing on the motions, the trial court originally granted the City's motion and denied the Pipeline Companies' motion. However, on a motion for reconsideration of its ruling, the trial court set aside its judgment, asked the parties to file new motions, and ended up

granting the Pipeline Companies' motion for summary judgment on the counterclaims and denying the City's motion. The portion of the suit concerning the City's counterclaims and third party claims against the Pipeline Companies was severed, and in this appeal, the City challenges the summary judgment denying those claims.

In pursuing its appeal, and in connection with its first four issues, the City presents four theories as to why the easement is void and in its fifth issue, argues it is not estopped to challenge the validity of the easement. Finding the easement valid and the doctrine of estoppel applicable, we affirm the judgment of the trial court.

The City theorizes the easement is not valid because 1) it violates article II, section 18 of the City charter, 2) it violates article 1175 of the Revised Civil Statutes, 3) it violates article I, section 17 of the Texas Constitution, and 4) it violates article III, section 52 of the Texas Constitution.

The standards applicable to appellate review of summary judgments are by now so well established that a lengthy recitation of them is not necessary. Suffice it to say, the movant must show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548–49 (Tex.1985). In deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the nonmovant will be taken as true, every reasonable doubt must be resolved in favor of the nonmovant and any doubts resolved in its favor. *Id.*

Because resolution of the City's first two issues turns on the same legal question, we will consider and discuss those issues together. Article II, section 18 of the City's charter, in relevant part, provides:

Said City shall have the power and authority to grant franchises for the use and occupancy of streets, avenues, alleys, and any and all public grounds belonging to or under the control of the City, no telephone, electric light or power, ... gas company, waterworks, water systems, or any other character of public utility shall be granted any franchise or be permitted the use of any street, avenue, alley, highway or grounds of the City without first making application to, and obtaining the consent of the governing authority thereto expressed by ordinance, ... publication of said ordinance, as finally proposed to be passed, shall be made in a newspaper published in the City of Lubbock, once a week for three (3) consecutive weeks, which publication shall be made at the expense of the applicant desiring said grant and said proposed ordinance....

\* \* \*

No franchise shall ever be granted by the Council other than an indeterminate franchise or a franchise for a period of years not exceeding twenty, except in cases where an election is held, as above provided....

This provision of the charter implements the authority granted the City by article 1175 of the Revised Civil Statutes, which provides:

A home-rule municipality has the following powers:

1. To prohibit the use of any street, alley, highway or grounds of the city by any telegraph, telephone, electric light, ... gas company, or any other character of public utility without first obtaining the consent of the governing authorities expressed by ordinance and upon paying such compensation as may be prescribed and upon such condition as may be pro-

vided by any such ordinance. To determine, fix and regulate the charges, fares or rates of any person, firm or corporation enjoying or that may enjoy the franchise or exercising any other privilege in said city and to prescribe the kind of service to be furnished by such person, firm or corporation, and the manner in which it may be rendered, ...

2. Provided that in all cities of over twenty-five thousand inhabitants, the governing body of such city, where the public service of such city may require the same, shall have the right and power to compel any street railway or other public utility corporation to extend its lines of service into any section of said city not to exceed two miles, all told, in any one year.

Tex.Rev.Civ.Stat. Ann. art. 1175 (Vernon Supp.2000).

The City argues article 1175 and article II, section 18 of its charter, give it authority to prohibit the use of its property by the Pipeline Companies in instances in which the City has never passed an ordinance granting such companies a franchise. Because the authority granted by article 1175 only applies to "telegraph, telephone, electric light ... gas company, or any other character of public utility," it is apparent that the parties' dispute centers on whether the Pipeline Companies are a "public utility" within the purview of article 1175 and the City charter, because if the companies do not fit within that characterization, the provisions relied upon by the City would not be applicable and the easement would be valid. A second core issue is whether the property through which the pipeline passed was "grounds of the city" when the easement was granted.

### Pipeline Companies' Status as Public Utilities

Courts which have been faced with the question have had a difficult time trying to develop a general definition of the term "public utility." *See e.g., Gulf States Utilities Co. v. State,* 46 S.W.2d 1018, 1021 (Tex.Civ.App.—Austin 1932, writ ref'd). Black's Law Dictionary (5th Ed.) defines the term as follows:

A privately owned and operated business whose services are so essential to the general public as to justify the grant of special franchises for the use of public property or of the right of eminent domain, in consideration of which the owners must serve all persons who apply, without discrimination. It is always a virtual monopoly.

*Id.* at 1232. In several specific contexts, the Texas Legislature has defined the term. The definition most nearly applicable here is that contained in section 111.001 of the Natural Resources Code. For the purposes of Chapter 111 of the Code,[1] section 111.001 defines public utility to mean "a person, association of persons, or corporation that owns, operates, or manages crude petroleum storage tanks or storage facilities for the public for hire, either in connection with a pipeline, pipelines, or otherwise." Tex.Nat.Res.Code Ann. § 111.001 (Vernon 1993). However, because the Pipeline Companies only handle refined petroleum and do not provide crude petroleum storage, that definition is not applicable here.

The Pipeline Companies argue that it is "well-settled" that only the legislature has the power to declare a business to be a public utility, the legislature has not declared petroleum pipeline operations to be public utilities; thus, the pipeline companies are not public utilities. In support of

---

**1.** Chapter 111 of the Code deals with common carriers.

that theory, they cite three cases, namely, *Carney v. Southwestern Motor Transport, Inc.,* 153 Tex. 267, 267 S.W.2d 802 (1954); *Gulf States Utilities, supra,* and *Ladd v. Southern Cotton Press & Mfg. Co.,* 53 Tex. 172 (1880).

As relevant here, *Ladd* involved a claim by a cotton buyer that each of the major cotton compresses had colluded to charge unreasonable fees for services not performed. *Id.* at 186. The buyer reasoned that because the cotton compresses exercised such control over the business, they should be considered public utilities subject to regulation. However, in denying that argument, the court noted that the state imposed no barriers to the establishment of competing compresses, such as a state-issued permit or franchise, and it could not declare a business public "merely by reason of its extent." *Id.* at 188. The court went on to say that declaring a business public simply because of its size, would be a legislative function and should not be done by judicial fiat. *Id.* Without expressing an opinion on the continued vitality of the *Ladd* decision, the court's reasoning is not applicable here because the City does not argue that the Pipeline Companies are public utilities merely by virtue of their size. The asserted monopoly status of the Pipeline Companies is only a factor in the City's arguments.

The other two cases, *Carney* and *Gulf States,* both involved the interpretation and application of former article 7084 of the Revised Civil Statutes. That article concerned whether a business was entitled to pay franchise taxes at the lower rate applicable to public utilities. It provided:

all public utility corporations, which shall include every such corporation engaged in the business of a *public utility as defined by the laws of Texas* whose rates or services are regulated or subject to regulation in whole or in part, by

law, shall pay a franchise tax as provided in this Article, except the same shall be based on . . . .

267 S.W.2d at 803 (emphasis added). The court reasoned that the requirement be defined as a public utility "by the laws of Texas" was sufficiently definite to bar a judicial declaration of public utility status under that statute. *Id.* at 804.

In contrast, the language of article 1175 and the City's charter apply to specifically listed business entities and to "any other character of public utility." This, of course, is a much broader definition than that contained in former article 7084. It requires an examination and determination of the character of a business to decide if it is a "public utility" within the purview of those documents. In that connection, Texas courts have often examined the nature of an enterprise in deciding if it is a "public utility."

For example, in *Ayala v. Corpus Christi,* 507 S.W.2d 324 (Tex.Civ.App.— Corpus Christi 1974, no writ), the court was called upon to determine whether the establishment of an ambulance by the City of Corpus Christi was "any other public utility service or enterprise" requiring approval by a majority vote. *Id.* at 326. The specific wording of the Corpus Christi city charter provision was that a special election was required to approve the purchase, construction or operation of ". . . a system or systems of water works, gas or electric lighting plants, telephones, streetcars and sewers, or any other public utility service or enterprise." *Id.* The court applied the rule of *ejusdem generis* to hold that the phrase "other public utility service or enterprise" was not to be construed in its broadest sense but was "to apply to things of the same kind or class as specifically mentioned. (*I.e.,* water works, gas, electric, telephone, etc.)." *Id.* at 327. Because the institution of a public ambulance

service was incident to the police power of the city and did not require "a capital investment such as would a water works system, electric or gas utility," the court concluded that an ambulance service purchased and operated by the City of Corpus Christi was not, as such, a public utility. *Id*. at 328.

Another example of the scrutiny the courts have given the character of a business in determining whether it is a "public utility" is the discussion in *Wichita Falls v. Kemp Hotel Operating Co.*, 162 S.W.2d 150 (Tex.Civ.App.—Fort Worth 1942), *affirmed*, 141 Tex. 90, 170 S.W.2d 217 (1943). In that case, the court explicated "[a] 'public utility' has been described as a business organization which regularly supplies the public with some commodity or service such as gas, electricity, etc." *Id.* at 153. It went on to note "one of the distinguishing characteristics of a public utility is the devotion of private property by the owner to a service useful to the public and which the public has a right to demand so long as it shall be continued, with reasonable efficiency, under proper charges." *Id.*

■ Distilled, these opinions support the definition of a public utility contained in Black's Law Dictionary setting out the distinguishing characteristics of a public utility, namely, an entity providing essential services to the public at large and which has a monopoly or a virtual monopoly in performing those services. Parenthetically, the City also cites the dissenting opinion in *Davies Warehouse Co. v. Brown*, 137 F.2d 201 (Temp.Emer.Ct.App.1943), *reversed by Davies Warehouse Co. v. Bowles*, 321 U.S. 144, 64 S.Ct. 474, 88 L.Ed. 635 (1944). Although in reversing the lower court, the Supreme Court did not adopt *en toto* the reasoning of the dissent, it did set out many of the same suggested factors for determining public utility status, including

1) "an obligation to afford its facilities to the public generally upon demand," and 2) in "large measure an independence and freedom from business competition" by a) a monopoly status or b) a franchise from the State placing it in the position of a public utility. 137 F.2d at 217.

■ The City points to the Pipeline Companies' status as common carriers under the Natural Resources Code as evidence that they meet the public service criteria because they are required to provide services without discrimination, § 111.015, and have the power of eminent domain. Section 111.019.

To properly determine the easement was void when given, we must consider the statutes applicable in 1955, the year of its execution. The predecessor to section 111.015 was former civil statute 6045. The progenitor to section 111.019 was former article 6022. The substance of the former statutes was carried forward to the present Natural Resources Code.

Although the Pipeline Companies acknowledge they are common carriers under the Natural Resources Code, they argue they are not public utilities because, when the legislature undertook to define the term "public utility" for the purposes of Chapter 111 of the Natural Resources Code, it did not include pipeline operators in its definition. *See* § 111.001(2). That reasoning would also be applicable to the wording of the former statutes. *See* former article 6049a (defining public utilities).

The Pipeline Companies' status as common carriers is not as clear as their acknowledgment might appear. The record shows that the line in question is only used to transport gasoline, diesel, and turbine fuel. The "common carrier" definition in section 111.002 of the Natural Resources Code requires the transportation of crude petroleum, coal, or carbon dioxide. Its

predecessor limited the term to crude petroleum transporters. *See* Tex.Rev.Civ. Stat.Ann. art. 6018 (repealed). We have found no cases discussing whether a pipeline operator can be a common carrier when it does not transport one of the substances enumerated in the governing statute.

However, one document which might support the Pipeline Companies' status as common carriers is a tariff filed by Texas Pipeline effective April 1, 1985. It sets rates for transportation of gasoline and "petroleum oil distillates" between Amarillo and Lubbock at 48.50 cents per barrel with a minimum shipment of 10,000 barrels. The Pipeline Companies argue that because the services of the pipeline are not available to the public generally, no individual has any right to make a direct purchase of gasoline from the pipeline, *ergo*, their operation is not an indication of a "public utility." Even so, the City's arguments are that the activity of the Pipeline Companies relevant to the question would not be the sale of gasoline, but the furnishing of transportation service generally. The tariff would support a conclusion that the transportation services of the Texas Pipeline are available to the public. We recognize that the transportation service is so specialized that to place it in the same class as such retail services as the gas, telephone, and electric services enumerated in article 1175 would be inconsistent with the purpose of that statute.

Thus, we conclude that whether or not the Pipeline Companies are common carriers is not determinative of the question whether they are "public utilities" within the meaning of article 1175 and the City charter. This is true because if they are not common carriers because they do not transport crude petroleum, they would not

be obligated to provide services without discrimination, and would therefore lack the primary distinguishing character of public utilities. If they are common carriers, the legislature has resolved the question of which common carriers are also public utilities, *i.e.*, only those who provide crude petroleum storage facilities to the public. We may not ignore that legislative definition. Parenthetically, the City makes no claim that the Pipeline Companies provide crude petroleum services.

■ We also disagree with the City's conclusion that because the Pipeline Companies have the power of eminent domain,[2] they have a burden of "public service in return." That argument overlooks the distinction between the services provided by the Pipeline Companies and those provided by the statutorily defined "public utilities." The Pipeline Companies did not acquire the easement through the exercise of a power of eminent domain, but rather acquired it after the City owned the property and by agreement with the City. It is inappropriate to impose a burden "in return," when the City has already received the benefit to which it contracted. *See e.g., Loesch v. Oasis Pipe Line Co.,* 665 S.W.2d 595, 598 (Tex.App.—Austin 1984, writ ref'd n.r.e.) (construing former Texas Revised Civil Statute article 6050 § 1). Indeed, the easement was obtained some 45 years ago and is a property interest which is a vested right of the Pipeline Companies. *See Harris County Flood Control Dist. v. Shell Pipe Line Corp.,* 591 S.W.2d 798, 800 (Tex.1979). To now attempt to charge a franchise fee or require the obtaining of a franchise from the City for the use of that property interest could well constitute an unconstitutional taking of property under both the federal and

---

2. *See* Business Corporation Act, art. 2.01(b), and section 111 .019 of the Natural Resources Code (Vernon 1998) (formerly article 6022 of the Revised Civil Statutes).

state constitutions. *See City of Fort Worth v. Citizens Hotel Company,* 380 S.W.2d 60, 64 (Tex.Civ.App.—Fort Worth 1964, writ ref'd n.r.e.).

■ The City also argues that the regulations imposed upon the Pipeline Companies by statutes and Railroad Commission regulations are additional evidence of their true character as a "public utility." We do not agree that state regulatory power enures to the benefit of the City in determining the Pipeline Companies' status as a "public utility" within the City. Section 81.051 of the Natural Resources Code gives the Railroad Commission jurisdiction over all pipelines in the state. That jurisdiction is primary and plenary. *Bullock v. Shell Pipeline Corp.* 671 S.W.2d 715, 719 (Tex.App.—Austin 1984, writ ref'd n.r.e.). Here, the property upon which the easement was granted was not within the city limits at the time of the grant. *See* Tex.Rev.Civ.Stat.Ann. art. 1175 (Vernon 2000) (stating city's authority to regulate services provided by virtue of a franchise "in said city").

■ In its reply brief, the City supports its claim of authority to regulate the Larson property by stating it was within the range of the City's extraterritorial jurisdiction at the time of the grant. *See* Tex.Local Gov't Code Ann. § 42.021 (Vernon 1988). However, it fails to cite any summary judgment evidence in support of that position. Moreover, it is the general rule that a city may only exercise its powers within its corporate limits unless its authority is expressly extended. *See Austin v. Jamail,* 662 S.W.2d 779 (Tex.App.—Austin 1983, writ dism'd w.o.j.); *West Lake Hills v. Westwood,* 598 S.W.2d 681, 686 (Tex.Civ.App.—Waco 1980, no writ). The legislature has not made any express extension of the City's authority with regard to petroleum pipelines. We also note the observation in *Carney* that regulation by

the Railroad Commission does not make one a public utility "as defined by law." 267 S.W.2d at 804.

With regard to the Pipeline Companies' monopoly status over the City's gasoline supply, the City cites the affidavit of its "right-of-way agent" Ed Bucy. Examination of Bucy's affidavit shows that it merely states the pipeline at issue is "the only petroleum products pipeline coming into the City of Lubbock." It does not state that the pipeline is the only source of gasoline for the City and does not support the City's conclusion.

The City has not cited any case where a pipeline of this type was held to be a public utility. *But see Consolidated Water Co. v. City of Talco,* 116 S.W.2d 411 (Tex.Civ.App.—Texarkana 1938, no writ) (discussing "franchise or easement" for pipeline running to wells in the city for the purpose of transporting crude oil from those wells). Consideration of the factors we have set out and the summary judgment evidence establishes that the Pipeline Companies were not "public utilities" within the meaning of article 1175 or the City of Lubbock charter at the time the easement was granted.

■ To properly address the City's first two issues, we must consider whether the property was "grounds of the city" in the context of article 1175. The City relies exclusively upon the wording of the statute and interprets the phrase to mean real property owned by the City. We disagree.

■ First, the rule of *ejusdem generis* is applicable to statutes. *See e.g., Toungate v. Bastrop Indep. Sch. Dist.,* 842 S.W.2d 823, 828 (Tex.App.—Austin 1992, no writ). That canon of construction provides that when general words follow a designation of particular classes of things, the particular designation restricts the meaning of the general words. *Id.* Here,

the general words "grounds of the city" follow the specific terms street, alley, or highway. Each of those are public, not merely property to which the City has title. *See Johnston v. Llano County*, 15 Tex.Civ.App. 421, 39 S.W. 995, 996 (1897, no writ) (holding "grounds" did not mean all real estate but only referred to public grounds).

▅▅▅ Second, the City's interpretation is inconsistent with the remainder of article 1175. The second sentence of that statute addresses the power of a city to regulate the charges of those "enjoying or that may enjoy the franchise or exercising any other public privilege *in said city*" (emphasis added). This language evidences an intent of the legislature to limit the City's power to regulate public utilities to the city limits. *See also West Lake Hills*, 598 S.W.2d at 686. Moreover, the City charter does not use the term "grounds of the city." Rather, it refers to "public grounds belonging to or under the control of the city." At the time the City granted the easement to Texas Pipeline, the property was not dedicated to any public use or available for use by the public, it was leased for agricultural purposes.

▅▅▅ It is an established rule of statutory construction that words are to be given their plain meaning unless that meaning would lead to an absurd result. *See Fleming Foods of Texas, Inc. v. Rylander*, 6 S.W.3d 278, 284 (Tex.1999). We believe to accept the City's position that the phrase "grounds of the city" in article 1175 includes any real property owned by the City outside the city limits would be an incorrect interpretation. If, as the City contends, mere ownership of land outside the city limits gave it the power to regulate any public utility traversing the prop-

erty, it could purchase land anywhere in the state in anticipation of any public utility traversing the property and charge franchise fees from any pipeline subsequently crossing the property.[3] Such a result is inconsistent with the intent of the legislature expressed in article 1175 to giving home rule cities the power to regulate "in said city" and would interfere with the Railroad Commission's authority to regulate such pipelines. *See also West Lake Hills*, 598 S.W.2d at 686 (recognizing cities' regulatory power is generally limited to its boundaries).

In relevant part, article I, section 18 of the City charter is more narrowly drawn than article 1175. That provision only applies to "public grounds" owned or controlled by the City. As noted, when the City granted the easement, the grounds were not "public" but were leased for agricultural use. Because we hold the Pipeline Companies are not "public utilities" and, at the time the City granted the easement, the property was not ("grounds of the City"), we overruled the City's first two issues.

### Violation of Texas Constitution

▅▅▅ In the City's third issue, it argues that the 1955 easement is void as violative of article I, section 17 of the Texas Constitution. As relevant here, that section provides:

> [N]o irrevocable or uncontrollable grant of special privileges or immunities shall be made, but all privileges and franchises granted by the Legislature, or created under its authority shall be subject to the control thereof.

The City relies upon several cases that cited this provision as standing for the proposition that it prevents a city from

---

**3.** In theory, the City's argument would permit it to purchase land over which the Trans Alaskan pipeline crosses and seek franchise fees from the operators of that line.

taking any action that abdicates its governmental authority and responsibility to regulate use of public property by conveying that power to a private party. *See City of Houston v. Houston City St. Ry. Co.,* 83 Tex. 548, 19 S.W. 127 (1892) (30–year grant to use city streets for railway); *Bowers v. City of Taylor,* 24 S.W.2d 816, 817 (Tex.Comm.App.1930) (closing of city street and grant of exclusive control of it to company for 15 years); *Gay Inv. Co. v. Texas Turnpike Authority,* 510 S.W.2d 147, 149 (Tex.Civ.App.—Dallas 1974, writ ref'd n.r.e.) (agreement by turnpike authority to never build access road was void as abdication of its authority).

◼ Article I, section 17 is not applicable because the easement granted to Texas Pipeline was not, and is not, a special privilege or franchise, but is, rather, an interest in real property. *See Texas & P. RR. Co. v. El Paso,* 126 Tex. 86, 85 S.W.2d 245 (1935) (discussing the difference between franchises and easements). Moreover, because the property was outside the city limits at the time the easement was granted, the City had no governmental powers to abdicate. *West Lake Hills,* 598 S.W.2d at 686. It merely acted as any other real property owner could and conveyed away a portion of its interest in the land. The City charter authorizes the City to buy and sell real property and the easement grant was simply an exercise of that power. The City did not annex the Larson property until three years after granting the easement, and did so with actual or deemed knowledge of the easement. It has provided no authority supporting the proposition that the subsequent annexation of the land transformed the easement grant into a special privilege. The City's third issue is overruled.

◼ In its fourth issue, the City argues the easement violates article III, section 52 of the Texas Constitution, which prohibits cities from lending their credit or granting public money "in aid of" any corporation. The final sentence of the City's argument states its contention concisely: "Payment of three hundred dollars in 1955, is not adequate compensation to the public for doing business by transporting millions of barrels of petroleum products across public property over a span of more than forty years."

◼ It is the rule that when a party challenges the adequacy of consideration supporting a contract, courts will not look beyond the face of the contract unless there is unconscionability, bad faith, or fraud, in which case a court may consider the adequacy of consideration in the interest of equity. *See Martin v. Martin, Martin & Richards, Inc.,* 12 S.W.3d 120, 125 (Tex.App.—Fort Worth 1999, no writ). In order for the consideration to be deemed inadequate, it must be so grossly inadequate as to shock the conscience, being tantamount to fraud. *Cearley v. Cearley,* 331 S.W.2d 510, 512 (Tex.Civ.App.—Dallas 1960, no writ). We see no reason why the same analysis would not apply to the City's challenge here. The City has not presented any evidence that the $332 paid by Texas Pipeline was so below the market value of the easement as to amount to a gift or that the amount was the result of unconscionability, bad faith or fraud. The City's fourth issue is overruled.

### Estoppel

Even though our overruling of the City's first four issues leads to a holding that the easement is valid, a full discussion of the issues presented and briefed in this appeal requires us to consider the City's fifth and final issue. That issue presents the question whether the City is estopped from challenging the validity of the easement. In contending it is not estopped, the City advances two arguments. First, it posits,

municipalities are not estopped from challenging *ultra vires* or void acts and second, that municipalities are not estopped when acting in their governmental capacity.

## Ultra Vires or Void Acts

In *San Angelo v. Deutsch*, 126 Tex. 532, 91 S.W.2d 308 (1936), the court explicated that "the doctrine of equitable estoppel cannot ordinarily be invoked to defeat a municipality in the prosecution of its public affairs because of an error or mistake of, or because of a wrong committed by, one of its officers or agents which has been relied upon by a third party to his detriment." *Id.* at 310. The City asserts this general rule in its contention that the easement is void and it is not estopped from challenging its validity. Our disposition of the City's first four issues compels the conclusion that the City may not benefit from the rule because we find that the grant of the easement was not *ultra vires* or void. Parenthetically, we note that the *Deutsch* court recognized an exception to the general rule by holding that in cases where "the city received benefits from the irregular or wrongful act and afterwards sought to repudiate it," it could be estopped. *Id.*

## Acts in Governmental Capacity

In the second prong of its argument, the City invokes the benefit of the general rule that when a governmental unit is exercising its governmental powers, it may not be subject to estoppel. However, in doing so, the City recognizes that there is an exception to that rule in instances in which justice, honesty, and fair dealing require the imposition of estoppel. *See Farmer's Marine Copper Works v. City of Galveston*, 757 S.W.2d 148, 152 (Tex.App.—Houston [1st Dist.] 1988, no writ).

In *City of Hutchins v. Prasifka*, 450 S.W.2d 829 (Tex.1970), the court described that exception in the following language: "[t]here is authority for the proposition that a municipality may be estopped in those cases where justice requires its application, and there is no interference with the exercise of its governmental functions." *Id.* at 836. An early application of this principle occurred in *Krause v. City of El Paso*, 101 Tex. 211, 106 S.W. 121 (1907). In that case, the city engineer had erred in making a map showing that the tract of land in question was not city property when in fact it was actually city property. In reliance upon the city engineer's map, a homeowner had constructed a home upon the property. En route to holding that the city was estopped, the court noted that "it is generally recognized that there are exceptions to that rule" (the general rule of a municipality's freedom from the doctrine of estoppel), and that because the homeowner relied upon the map in purchasing the tract, and because of the long period of use by the homeowner without objection by the city, the city was estopped from asserting its title. *Id.*

However, even assuming, without deciding, that the City would not be estopped if it was acting in *its governmental capacity*, it has failed to show it was acting in a governmental capacity when it granted the easement.

It is well established in this state that the functions of a municipality are dual in nature. One function is legislative or governmental and the other is proprietary in nature. *City of Crosbyton v. Texas–New Mexico Utilities Co.*, 157 S.W.2d 418, 420 (Tex.Civ.App.—Amarillo 1941, writ ref'd w.o.m.).

The City has cited two cases that are instructive in determining the difference between acts that are governmental and those which are proprietary in

nature. *In City of Houston v. Quinones,* 142 Tex. 282, 177 S.W.2d 259 (Tex.1944), the court instructs:

> The underlying test is whether the act performed by a city is public in its nature and performed as the agent of the State in furtherance of general law for the interest of the public at large, or whether it is performed primarily for the benefit of those within the corporate limits of the municipality.

*Id.* at 261. In *International Bank of Commerce v. Union Nat. Bank of Laredo,* 653 S.W.2d 539, 546 · (Tex.App.—San Antonio 1983, writ ref'd n.r.e), the court cited with approval a suggested distinction articulated by former Supreme Court Chief Justice Joe Greenhill.[4] We also find that explication cogent and applicable. It is as follows:

> Essentially, governmental functions are those normally performed by governmental units, *e.g.,* police and fire protection, while the proprietary functions are those that can be, and often are, provided by private persons, *e.g.,* gas and electric services.

██ Application of these definitions mandates a conclusion that in its actions with regard to the granting of the easement across the Larson tract, the City was acting in its proprietary role. The land was purchased to increase groundwater available to the City's residents. That was primarily for the benefit of the residents within the City's limits rather than the public at large. There is nothing essentially governmental about the mere fact of owning real property outside the City or in

granting an easement across that property.

The City argues that it was acting in its governmental capacity because it was granting permission for the use of its property. However, in that regard, the decision in *City of Corpus Christi v.. Gregg,* 155 Tex. 537, 289 S.W.2d 746 (1956), is instructive. In that case, our supreme court held that in granting an oil and gas lease upon property belonging to it, the City of Corpus Christi was acting in a proprietary capacity and was thus subject to estoppel. *Id.* at 750–51. We hold the City was subject to the doctrine of estoppel because it acted in its proprietary capacity in executing the easement.

██ Moreover, even if the City had been acting in its governmental capacity, under the facts of this case, it was still subject to estoppel because it fell within an exception to the general rule that a municipal corporation may not be estopped when it acts in a governmental role. In *Gregg,* the court also observed:

> where the action taken or contract made was not *ultra vires,* but is within the power of a city to make, and where the city has accepted and retained the benefits arising from the contract, and stood by and permitted the other party its funds under the contract, the city is estopped to deny that a contract existed.

*Id.* at 751.

Similarly, in *Farmer's Marine Copper Works, Inc. v. City of Galveston,* the court specifically noted "courts have held that municipal corporations may be estopped where justice, honesty, and fair dealing require it." 757 S.W.2d at 152.[5] *See also*

---

4. Greenhill and Murto, Governmental Immunity, 49 Tex.L.Rev. 462, 463 (1971).

5. Although in the City's brief it quotes the *Farmer's Marine* court's explication as "when justice, honesty, and fair dealing require, *and if no governmental function will be impaired,*"

the italicized portion does not appear in that opinion. It does, however, appear in the *Prasifka* opinion. *See* 450 S.W.2d at 836. The difference is immaterial, however, as application of the estoppel doctrine does not impair the City's governmental functions.

*Deutsch,* 91 S.W.2d at 310; and *Krause,* 106 S.W. at 123.

Here, the City accepted and retained the $332 payment for the easement and stood by while the Pipeline Companies expended considerable funds upon the construction of a pipeline in reliance upon the easement. Indeed, the City made no objection to the use of its easement for 24 years. The City's fifth issue is overruled.

In sum, none of the City's issues present reversible error. Accordingly, they are all overruled and the judgment of the trial court is affirmed.