Footnotes in HTML versions of opinions 
are designated by superscript “balloons” or boxes (click on either for the 
footnote text) and are not numbered. For an exact copy of the opinion, retrieve 
the Adobe PDF version.
IN THE SUPREME COURT OF 
TEXAS
════════════
No. 03-0547 
════════════
BMG Direct 
Marketing, Inc., Petitioner,
v.
Patrick Peake, 
Individually and as Representative of Others Similarly Situated, 
Respondent
════════════════════════════════════════════════════
On Petition for Review from 
the
Court of Appeals for the Ninth District of 
Texas
════════════════════════════════════════════════════
Argued February 18, 2004 
            Justice O’Neill delivered the opinion of 
the Court, in which Chief Justice 
Jefferson, Justice Hecht, Justice Brister, Justice Medina, Justice Green, 
Justice Johnson, and Justice 
Willett joined.
            Justice Hecht filed a concurring 
opinion. 
            Justice Wainwright filed a concurring 
opinion.
            In 
this class-action case, the trial court certified a class of music club members 
who paid allegedly illegal late fees for failing to timely pay for compact discs 
in accordance with the terms of a membership agreement. The parties dispute 
whether the customers’ claims are subject to the voluntary-payment rule, which 
has sometimes been successfully invoked to bar restitution of money that has 
been voluntarily paid with full knowledge of all the facts and without fraud, 
deception, duress, or coercion. Although the voluntary-payment rule’s 
application has been largely supplanted by the creation of legal and statutory 
remedies, we conclude that the rule applies to the customers’ claims for 
restitution of late fees in this case. Because the trial court failed to analyze 
the rule’s effect on the requirements for class certification and how the claims 
in this case would be tried, we decertify the class and remand the case to the 
trial court for proceedings consistent with this opinion.
I. 
Background 
            BMG 
Direct Marketing operates music clubs that sell compact discs to club members, 
principally through direct mail and online services. Membership in a BMG club 
begins with one of a variety of special promotions, typically “11 CDs for the 
price of one” or “12 CDs for the price of one.” BMG assesses a late fee of $1.50 
if club members do not pay for the compact discs within thirty days. All BMG 
promotions include a statement that late fees will apply to past-due BMG 
invoices. Each customer’s initial shipment of compact discs includes a 
Membership Guide which provides: “Payment is due when you receive your shipment. 
Late charges will be added to your account for amounts unpaid after 30 days.” In 
addition, each BMG shipment, including the initial one, contains an invoice 
which specifies: “If payment is not made within 30 days, a late charge of $1.50 
will be added to your account (not a finance charge).” 

 Customers are given ten 
days to decline membership for any reason and may return the compact discs at 
BMG’s expense with no further obligation.
            Named 
plaintiff Patrick Peake was a BMG club member who bought dozens of compact discs 
from the company from 1999 to 2002. During this period he incurred and paid to 
BMG late fees totaling $7.35. In 2002, Peake sued BMG to recover the late fees 
he had paid, claiming they constituted an illegal penalty because the fee 
charged did not reasonably forecast BMG’s actual damages resulting from 
customers’ late payments.
            Peake 
moved to certify a class consisting of all present and former BMG club members 
in Texas who had paid BMG late fees since May 16, 1998. BMG opposed the motion, 
arguing that the voluntary-payment rule applied to each potential class member’s 
claims and precluded a finding that common issues would predominate. The trial 
court certified the class, noting that it was “unlikely” the voluntary-payment 
rule would apply in this case because the rule is equitable and “need not be 
applied where the rationale for its existence does not exist.” The trial court 
further held that, even if the voluntary-payment rule did apply, the “issue is 
not individual and may be determined as another common issue on a class wide 
basis.” A divided court of appeals affirmed without deciding whether or not the 
rule applied, holding that in either event the class members’ lack of full 
knowledge based upon BMG’s failure to disclose all material facts in the 
agreement would be a question common to the entire class. ___ S.W.3d ___, ___. 
We granted BMG’s petition to consider the voluntary-payment rule’s application 
to this case.
II. Liquidated Damages 
            Peake 
claims that BMG’s late fees constitute an unlawful penalty. In Texas, we 
distinguish a permissible liquidated damages clause from an unenforceable 
penalty. Phillips v. Phillips, 820 S.W.2d 785, 788 (Tex. 1991). For such 
a clause to be enforceable, the fee charged must be a reasonable estimate of 
damages, and those damages must be incapable of precise calculation. Id. 
Companies enter into late-fee agreements with their customers because the 
precise damages that will result from their customers’ untimely payments is 
generally difficult if not impossible to ascertain. See 24 Samuel Williston & Richard A. Lord, 
Williston on Contracts § 65:1, at 
229 (4th ed. 2002) (observing that a “liquidated damages clause is designed to 
substitute a sum agreed upon by the parties for any actual damages suffered as a 
result of a breach”); see also Phillips, 820 S.W.2d at 788 (“[T]o be 
enforceable as liquidated damages the damages must be uncertain . . . .”). In 
this way, parties allocate the risk of uncertainty over the actual loss that 
will be realized if a customer’s payment is not timely. By entering into these 
contractual arrangements, “the need for the nonbreaching party to prove actual 
damages” is obviated. Williston & 
Lord, supra, § 65:1, at 230 (quoting Bair v. Axiom Design, 
L.L.C., 20 P.3d 388 (Utah 2001)). The agreed upon late fee thus quantifies a 
level of uncertainty — that both parties recognize — and allocates the risk of 
that uncertainty between the contracting parties.
            The 
uncertainty inherent in calculating damages attributable to customers’ untimely 
payments is aptly demonstrated in the case law through the varied testimony of 
battling experts. 

 Allowing parties to 
contractually allocate this risk of uncertainty carries out Texas’s public 
policy strongly favoring the freedom of parties to contract. See, 
e.g., In re Prudential Ins. Co. of Am., 148 S.W.3d 124, 129 (Tex. 
2004) (“As a rule, parties have the right to contract as they see fit as long as 
their agreement does not violate the law or public policy.”); Wood Motor Co. 
v. Nebel, 238 S.W.2d 181, 185 (Tex. 1951). As we have said: 
[I]f there is one thing which more 
than another public policy requires it is that men of full age and competent 
understanding shall have the utmost liberty of contracting, and that their 
contracts when entered into freely and voluntarily shall be held sacred and 
shall be enforced by Courts of justice. Therefore, you have this paramount 
public policy to consider — that you are not lightly to interfere with this 
freedom of contract.
Wood Motor Co., 238 S.W.2d 
at 185 (quoting Printing & Numerical Registering Co. v. Sampson, 19 
L.R.Eq. 462, 465 (1875)). 
            Although 
parties may contractually allocate the risk of uncertainty over the amount of 
damages that will be incurred in the event of untimely payment, liquidated 
damages still must be a reasonable estimate of damages in order to be 
enforceable. In this case, Peake paid BMG’s late fees without protest and only 
later asserted that they were unenforceable; under these circumstances, BMG 
contends, Peake’s claims (and those of the class) are subject to the 
voluntary-payment defense. Before addressing this argument, we examine the 
voluntary-payment doctrine’s underpinnings and its development in our 
jurisprudence. III. History of the 
Voluntary-Payment Rule
            More 
than fifty years ago, we stated the common-law voluntary-payment rule as 
follows: “‘[M]oney voluntarily paid on a claim of right, with full knowledge of 
all the facts, in the absence of fraud, deception, duress, or compulsion, cannot 
be recovered back merely because the party at the time of payment was ignorant 
of or mistook the law as to his liability.’” Pennell v. United Ins. Co., 
243 S.W.2d 572, 576 (Tex. 1951) (quoting 40 Am. Jur. § 205 (1942)). The rule is a 
defense to claims asserting unjust enrichment; that is, when a plaintiff sues 
for restitution claiming a payment constitutes unjust enrichment, a defendant 
may respond with the voluntary-payment rule as a defense. See Randazzo v. 
Harris Bank Palatine, N.A., 262 F.3d 663, 670 (7th Cir. 2001) (noting that 
exceptions to the voluntary-payment rule are designed “to foster the 
restitutionary principles that have long stood in tension with the voluntary 
payment rule”); Restatement (Third) of 
Restitution & Unjust Enrichment § 6 cmt. e (Tentative Draft No. 1, 
2001) (“The restitution claim to recover a payment in excess of an underlying 
liability . . . meets an important limitation in the so-called voluntary-payment 
rule.”); see, e.g., Brown v. Oaklawn Bank, 718 S.W.2d 678, 681 
(Tex. 1986) (affirming restitution and rejecting voluntary-payment defense as 
payee had not detrimentally relied on payment).
            This 
Court recognized the rule as early as 1880 in Ladd v. Southern Cotton Press 
and Manufacturing Co., 53 Tex. 172 (1880). In that case, Ladd, a cotton 
buyer, sued to recover money he paid to Southern Cotton Press, claiming that the 
payments were made involuntarily, under duress, and without consideration. 
Ladd, 53 Tex. at 173-74. Ladd alleged duress arising from the defendant’s 
unlawful combination with others to charge an amount greater than the services 
rendered were reasonably worth or that, in some instances, were not even 
performed. We rejected Ladd’s assertion of duress, noting that the defendant’s 
business was “open to all who wished to engage in it” and that “any one engaging 
in it may prescribe the terms upon which he will transact it. All parties 
employing his services, knowing his terms, would be bound by them.” Id. 
at 193. We concluded that the voluntary-payment rule applied to bar Ladd’s 
claims, stating: 
As it appears from the petition 
that the payments were made with full knowledge of all the facts and without 
fraud or deception, unless made under duress, the amount thus paid cannot be 
recovered back, although so much as exceeds the reasonable value of the services 
rendered was paid without consideration. 
Id. at 192. There being no 
evidence of duress, we held that “[a]ppellant certainly had ample time and 
opportunity to have had his day in court, before the business between him and 
appellee was closed by the last voluntary payment made by him. Not having 
complained until the late date at which this suit was brought, he cannot now be 
heard to complain.” Id. at 194.
            When 
the voluntary-payment rule is applied between private parties, as in 
Ladd, the underlying public policy has been described as follows: 

[A] party who pays a claim is 
deemed to have made his own decision that it is justly due. If he thinks 
otherwise, he should resist. He should not pay out his money, leading the other 
party to act as though the matter were closed, and then be in a position to 
change his mind and invoke the aid of the courts to get it back. 
R.G. McClung Cotton Co. v. 
Cotton Concentration Co., 479 S.W.2d 733, 743 (Tex. Civ. App.—Dallas 1972, 
writ ref’d n.r.e.). We have acknowledged that public policy favors protecting 
the finality of payments when a person is aware of all the facts upon which the 
liability to make payment depends, and there is no fraud, deception, duress, or 
coercion involved. Because of these policy concerns, this Court and Texas courts 
of appeals have, at times, applied the voluntary-payment rule between private 
parties. See Pennell, 243 S.W.2d at 575-76 (disallowing an insurance 
company recovery of payments made under a mistake of law because “money 
voluntarily paid on a claim of right, with full knowledge of all the facts, in 
the absence of fraud, duress, or compulsion, cannot be recovered back merely 
because the party at the time of payment was ignorant of or mistook the law as 
to his liability”); Gilliam v. Alford, 6 S.W. 757, 759 (Tex. 1887) 
(disallowing recovery of a “voluntary settlement” when “the money was paid under 
a mistake of law; for it is well settled that money paid under a mistake of law 
with respect to liability to make payment, but with full knowledge of all the 
facts on which the claim for payment is based, and on which the right to resist 
it depends, cannot be recovered”); Ladd, 53 Tex. at 192-94; see 
also Sw. Indus. Import & Export, Inc. v. Borneo Sumatra Trading 
Co., 666 S.W.2d 625 (Tex. App.—Houston [1st Dist.] 1984, writ ref’d n.r.e.) 
(discussing the rule in the context of sale of goods); R.G. McClung Cotton 
Co., 479 S.W.2d at 743-44 (discussing the rule in the context of sale of 
goods, but allowing recovery because payor never intended to surrender his claim 
for damages for breach of contract); Runcie v. Runcie, 407 S.W.2d 861 
(Tex. Civ. App.—Amarillo 1966, writ ref’d n.r.e.) (discussing the rule in the 
context of payment of bank note); Am. Cas. & Life Ins. Co. v. Boyd, 
394 S.W.2d 685 (Tex. Civ. App.—Tyler 1965, no writ) (discussing the rule in 
context of payment of insurance premiums); but see TCI Cablevision of Dallas, 
Inc. v. Owens, 8 S.W.3d 837 (Tex. App.—Beaumont 2000, pet. dism’d by agr.) 
(discussing the voluntary payment rule in the context of cable late fees but 
concluding “it is far from clear that the voluntary payment doctrine applies 
here”).
            The 
voluntary-payment rule has also been applied, albeit infrequently, to prohibit 
recovery of illegal taxes paid to the sovereign. This Court has stated: “A 
person who voluntarily pays an illegal tax has no claim for its repayment” 
unless that person paid under duress. Austin Nat’l Bank v. Sheppard, 71 
S.W.2d 242, 245-46 (Tex. 1934). In City of Houston v. Feizer, 13 S.W. 
266, 267-68 (Tex. 1890), we refused recovery to a butcher who had paid taxes to 
the city that the city was not authorized to collect. There, we observed that 
the rule against recovery of voluntary payments “precludes the courts being 
occupied in undoing the arrangements of parties which they have voluntarily 
made, and into which they have not been drawn by fraud or accident, or by any 
excusable ignorance of their legal rights and liabilities.” Id. at 267; 
see also Nat’l Biscuit Co. v. State, 135 S.W.2d 687, 693-94 (Tex. 1940) 
(allowing recovery of permit fees and franchise taxes paid to the state under 
laws which were later declared unconstitutional because money was paid under 
duress); Sheppard, 71 S.W.2d at 246 (allowing recovery of taxes paid when 
an asphalt company paid under implied duress); Galveston Gas Co. v. County of 
Galveston, 54 Tex. 287, 292 (1881) (allowing recovery when “the taxes having 
been paid under protest to prevent the sale and consequent cloud on title, the 
payment was so far compulsory as to allow of a recovery back, if sought with 
reasonable promptness”); County of Galveston v. Gorham, 49 Tex. 279, 302, 
308 (1878) (holding that it was “not unconscionable” for the county to retain 
funds paid to it when the payment was made voluntarily “because it was without 
objection paid under a mistake of law . . . and there was no mistake of fact in 
paying it, and no deceit, fraud, or compulsion used in collecting it, or in 
causing it to be paid”). In the taxation context, the voluntary-payment rule is 
intended to “prevent the taxing entity from using funds paid by taxpayers in a 
given budget year and subsequently being required to refund these amounts.” 
City of Laredo v. S. Tex. Nat’l Bank, 775 S.W.2d 729, 731 (Tex. App.—San 
Antonio 1989, writ denied); see also Salvaggio v. Houston Indep. Sch. 
Dist., 752 S.W.2d 189, 193 (Tex. App.—Houston [14th Dist.] 1988, writ 
denied) (“The policy behind the rule is to discourage litigation and to secure 
the taxing authority in the orderly conduct of its affairs.”).
            Although 
the voluntary-payment rule has been applied, at times, in both the private and 
public contexts, other legal and statutory remedies have evolved over time to 
supplant the rule’s application in many of these contexts. 

 Like other equitable claims 
and defenses, an adequate legal remedy may render equitable claims of unjust 
enrichment and equitable defenses of voluntary-payment unavailable. See, 
e.g., Fortune Prod. Co. v. Conoco, Inc., 52 S.W.3d 671, 684 (Tex. 
2000) (holding unjust enrichment inapplicable when parties have express contract 
covering the subject matter of the parties’ dispute); Bexar Bldg. & Loan 
Ass’n v. Robinson, 14 S.W. 227, 228 (Tex. 1890) (holding usury statute 
prevented voluntary-payment defense). For example, the Texas Tax Code now 
provides that a person may recover a voluntary payment of certain illegal taxes, 
as long as the person paid under protest. Tex. Tax Code § 112.051(a) (“If a person 
who is required to pay a tax or fee imposed by this title or collected by the 
comptroller under any law . . . contends that the tax or fee is unlawful . . . 
the person shall pay the amount claimed by the state, and if the person intends 
to bring suit under this subchapter, the person must submit with the payment a 
protest.”); see also McKesson Corp. v. Div. of Alcoholic Beverages & 
Tobacco, 496 U.S. 18, 22 (1990) (“[I]f a State penalizes taxpayers for 
failure to remit their taxes in timely fashion, thus requiring them to pay first 
and obtain review of the tax’s validity later in a refund action, the Due 
Process Clause requires the State to afford taxpayers a meaningful opportunity 
to secure postpayment relief for taxes already paid pursuant to a tax scheme 
ultimately found unconstitutional.”). Likewise, the voluntary-payment rule is no 
longer outcome determinative when deciding whether a judgment voluntarily paid 
moots an appeal. Now, the payment of a judgment without an “expressed intent” to 
continue an appeal moots the appeal, but payment with such an expression does 
not. See Miga v. Jensen, 96 S.W.3d 207, 212 (Tex. 2002); see also 
Riner v. Briargrove Park Prop. Owners, Inc., 858 S.W.2d 370, 370-71 (Tex. 
1993); Cont’l Cas. Co. v. Huizar, 740 S.W.2d 429, 430 (Tex. 1987) 
(holding that an appeal was properly dismissed as moot where appellant paid the 
judgment without duress); Highland Church of Christ v. Powell, 640 S.W.2d 
235, 236-37 (Tex. 1982) (holding that payment of judgment did not moot appeal 
when paid under duress); Employees Fin. Co. v. Lathram, 369 S.W.2d 927, 
929 (Tex. 1963); Cravens v. Wilson, 48 Tex. 321, 323-24 (Tex. 1877). 
Furthermore, whether an insurer’s voluntary payment of a claim can be recovered 
or reimbursed is considered a matter of contract, 

 and whether a bank may 
recover voluntary payments mistakenly made to depositors is now governed by 
chapter 4 of the Uniform Commercial Code. 

 
            Thus, 
although the voluntary-payment rule may have been widely used by parties and 
some Texas courts at one time, its scope has diminished as the rule’s equitable 
policy concerns have been addressed through statutory or other legal remedies. 
Indeed, this Court has affirmatively applied the rule only once in the last 
forty years, and that holding has itself been modified since. See Huizar, 
740 S.W.2d at 430 (holding voluntary payment of judgment without duress, 
although under protest, mooted appeal); cf. Miga, 96 S.W.3d at 212 
(holding payment of judgment will not moot appeal if accompanied by clear 
expression of intent to prosecute appeal). Nevertheless, we have never abrogated 
the voluntary-payment rule, and it still has limited application in Texas 
jurisprudence. 
IV. The Voluntary-Payment Rule’s Application in this 
Case
            As 
already noted, the trial court and court of appeals rejected BMG’s assertion 
that the voluntary-payment defense precluded certification on three grounds: (1) 
it was “unlikely” the defense would apply, (2) the rationale for it did not 
exist in this case, and (3) if it did apply, it could be decided on a class-wide 
basis. ___ S.W.3d at ___. As to the first two grounds, there is nothing in the 
record or Texas law to indicate that the voluntary-payment rule should not 
generally apply to a customer’s claim for restitution of a contractually 
agreed-upon late fee alleged to be an unenforceable illegal penalty, nor have 
other remedies supplanted the rule’s application in that context. As to the 
latter point, the trial court did not analyze the potential difficulties in 
applying the rule on a class-wide basis and we are unable to assess the issue on 
the record before us. 
A. 
The Rule in Other Jurisdictions
            Neither 
the voluntary-payment rule nor the type of class litigation involved here is 
unique to Texas. Citing its own decision in TCI Cablevision, 8 S.W.3d at 
845, the court of appeals found a “split of authority” that made it “far from 
clear” whether the voluntary-payment rule would apply. ___ S.W.3d at ___. But 
the split of authority is mostly one-sided; indeed, the court of appeals stands 
almost alone. With one exception, courts in every other jurisdiction have 
applied the voluntary-payment rule to claims that a late fee like the one here 
is an illegal penalty. See Hill v. Galaxy Telecom, 2000 U.S. Dist. LEXIS 
2404 at *6 (N.D. Miss. 2000); Horne, 119 F. Supp. 2d at 630; 
Putnam, 649 N.W.2d at 631-33; Dillon v. U-A Columbia Cablevision, 
740 N.Y.S.2d 396, 398 (N.Y. App. Div. 2002); Telescripps Cable Co., 542 
S.E.2d at 643; Hassen., 751 So.2d at 1290; McWethy, 988 P.2d at 
358; see also Smith v. Prime Cable of Chicago, 658 N.E.2d at 1330, 
1332-34 (holding voluntary payment barred class action alleging pay-per-view 
show lasted two hours rather than three as advertised). 
            On 
the other side, one court has held that the voluntary-payment rule did not apply 
because late fees were not paid voluntarily when customers faced the “duress” of 
losing their cable television service. Whiteman, 802 N.E.2d at 890-93. 
Texas law has always required more than this to constitute “duress” under the 
voluntary-payment rule. See Ladd, 53 Tex. at 193 (holding private 
company’s refusal to do business except on its own terms “cannot be held to be 
duress”). 
            While 
this Court has never addressed the voluntary-payment rule’s application to late 
fees, we long ago applied the rule in a similar context. In Hirshfield v. 
Fort Worth National Bank, 18 S.W. 743 (Tex. 1892), a notary charged the 
maker of a note a $3.50 “protest fee” for demanding payment on a past-due note, 
when in fact the note was not yet due. Id. at 744. Applying the 
voluntary-payment rule, this Court held that a fee “paid by the plaintiff 
voluntarily, with full knowledge of all the facts, and, at most, only under a 
mistake of law, cannot be recovered back.” Id. at 746. 
            Contrary 
to the court of appeals’ opinion, we do not find a substantial split of 
authority in Texas or across the nation generally that would categorically bar 
application of the voluntary-payment rule to the circumstances presented here. 
Thus, the trial court erred in concluding that the
 
 
rule was “unlikely” to apply in 
this case.
B. 
The Rule’s Requirements 
            Nor 
do we agree that the rationale behind the voluntary-payment rule can be 
categorically dismissed, as the trial court did here. The Wisconsin Supreme 
Court has explained that the voluntary-payment rule “allows entities that 
receive payment for services to rely upon these funds and to use them unfettered 
in future activities,” and it “operates as a means to settle disputes without 
litigation by requiring the party contesting the payment to notify the payee of 
its concerns. After such notification, a payee who has acted wrongfully can 
react to rectify the situation.” Putnam, 649 N.W.2d at 633. We, too, 
recognize the benefit of a rule that allows entities to rely on contractually 
agreed-upon late fees received from customers who, having failed to protest, 
appear to have willingly paid with full knowledge of all the facts and without 
fraud, deception, coercion, or duress, for “a person who receives payment from 
another without any protest from the payor should be allowed to rely on use of 
the funds without risking a subsequent demand for return of the payment.” 
Id. at 635. The voluntary-payment rule also encourages discourse, rather 
than litigation, between customers and private enterprises that charge late fees 
in the course of their business. 
            Of 
course, for the voluntary-payment rule to apply, a person must pay “with full 
knowledge of all the facts.” See, e.g., Ladd, 53 Tex. at 
192; Tyler v. Tyler, 742 S.W.2d 740, 743 (Houston [14th Dist.] 1987, writ 
denied) . Peake contends that to satisfy this requirement, BMG’s customers must 
have known that the late fees were illegal and unenforceable when they paid 
them. Peake contends that because BMG did not disclose how the late fee was 
calculated, he and the other club members did not know and could not have known 
whether or not the fees charged were penal in nature or were a reasonable 
forecast of BMG’s actual or estimated damages. Therefore, according to Peake, he 
and the other club members lacked “full knowledge of all the facts,” precluding 
the voluntary-payment rule’s application. 
            BMG, 
on the other hand, contends it fully disclosed its late-fee policy to club 
members. When it shipped CDs to members, BMG made them aware of the late-fee 
amount and the circumstances under which it would be imposed, and offered them 
the opportunity to return the items with no further obligation. According to 
BMG, this gave its customers “full knowledge of all the facts” sufficient to 
trigger the voluntary-payment rule’s application. 
            We 
agree with BMG that knowledge of a late fee’s amount and the circumstances under 
which it will be imposed is sufficient to charge one with “full knowledge of the 
facts” for purposes of the voluntary-payment rule’s application. Accord 
Dillon v. U-A Columbia Cablevision of Westchester, Inc., 790 N.E.2d 1155, 
1156 (N.Y. 2003); Putnam, 649 N.W.2d at 634. To hold otherwise would pose 
substantial practical problems. As the Wisconsin Supreme Court observed, 
accepting the argument that the voluntary-payment rule’s “full knowledge” 
requirement means a company has to disclose to customers precisely how its late 
fee was calculated “would tacitly suggest that all demands for payment in 
business transactions would need to be accompanied by an itemized list 
explaining the basis for each charge, so that the payor had full knowledge of 
the facts as required by the voluntary payment doctrine.” Putnam, 649 
N.W.2d at 634. Even then, the payor could presumably challenge the basis 
asserted, with the result that the “full knowledge” requirement could never be 
met. It would be impractical and unfair to parties entering into late-fee 
agreements to interpret the “full knowledge” requirement in the way Peake 
proposes. We therefore decline to adopt an interpretation of the 
voluntary-payment rule that would eviscerate its purpose and create such an 
enormous burden on those who charge legitimate late fees in the regular course 
of their business. 
            We 
note that at least one court has held that customers who pay late fees with 
knowledge of the fee’s amount and the circumstances under which it will be 
charged, do so under a mistake of law rather than a mistake of fact. 
Putnam, 649 N.W.2d at 633. And it is well settled in Texas that payment 
made under a mistake of law is not an exception to the voluntary-payment rule. 
See Pennell, 243 S.W.2d at 575-76 (voluntary payment cannot be recovered 
“merely because the [payor] . . . was ignorant of or mistook the law as to his 
liability”); Gilliam, 6 S.W. at 759 (“Money paid under a mistake of law . 
. . cannot be recovered.”); Putnam, 649 N.W.2d at 635 (observing that a 
mistake of law “does not represent the type of wrongful action that should be 
excepted from the voluntary payment doctrine”); but see City of Taylor v. 
Hodges, 186 S.W.2d 61, 63 (Tex. 1945) (refusing to apply the rule that 
“relief cannot be had from a payment made under a mistake of law” to situations 
in which “the payment is made with public money”). Thus, if Peake or any other 
club members paid BMG’s late fees under a mistake of law, i.e., believing 
that the fees were a reasonable estimation of damages and not an illegal 
penalty, they may still be charged with full knowledge of the facts for purposes 
of the voluntary-payment rule. 
            We 
recognize that the Indiana Supreme Court has taken a different approach to 
applying the voluntary-payment rule, one that it acknowledges is contrary to the 
great weight of authority. See Whiteman, 802 N.E.2d at 891. 


 That court relied largely 
on the Tentative Draft of the Restatement (Third) of Restitution & Unjust 
Enrichment, which defines a voluntary payment as one “paid in the face of a 
recognized uncertainty as to the existence or extent of the payor’s obligation 
to the recipient.” Restatement (Third) of 
Restitution & Unjust Enrichment § 6 cmt. e (Tentative Draft No. 1, 
2001). We agree with the Draft Restatement’s articulation of the full-knowledge 
requirement as contemplated by the voluntary-payment rule: “When properly 
employed, a reference to ‘voluntary payment’ is judicial shorthand for a truth 
of common experience: that a person must often choose to act on the basis of 
imperfect knowledge, accepting the risk that further information (acquired with 
the benefit of hindsight) may reveal the choice to have been less than optimal.” 
Id. As we have said, late-fee arrangements like the one BMG and Peake 
contracted for are designed to allocate the risk of a recognized 
uncertainty that arises from the parties’ imperfect knowledge regarding the 
precise amount of damages that will result if payments are not timely. Thus, 
when a person pays a late fee knowing its amount and the circumstances under 
which it would be imposed, that person pays in the face of a recognized 
uncertainty sufficient to satisfy the voluntary-payment rule’s full-knowledge 
requirement.
C. 
Challenges to the Rule’s Application
            Peake 
launches several challenges to the voluntary-payment rule’s application in this 
case. First, he contends Texas courts have been more willing, and rightly so, to 
apply the voluntary-payment rule in order to protect the sovereign’s income 
stream because the rule’s justification in the taxation context is an 
appropriate extension of the sovereign-immunity principle. However, as we noted 
above, a different legal framework now governs the payment of most illegal 
taxes. See Tex. Tax Code §§ 
112.051, .052; McKesson, 496 U.S. at 22, 31. Moreover, this Court has 
not, in the past, limited the voluntary-payment rule only to public suits. 
See Pennell, 243 S.W.2d at 575-76; Gilliam, 6 S.W. at 759; 
Ladd, 53 Tex. at 192-94. 

 
            The 
distinction between public and private entities should not alter the 
voluntary-payment rule’s application. The Wisconsin Supreme Court has observed 
that
there are differences between 
funds received by a governmental body through taxation and revenue received by a 
private entity from business transactions. However, for purposes of applying the 
voluntary payment doctrine, the principles are similar. Both the public and 
private sectors should be able to rely on these resources. The voluntary payment 
doctrine provides stability and certainty once funds have been transferred 
without notice of dispute, thereby decreasing the transaction costs that would 
accrue if payments received long ago could be demanded back.
Putnam, 649 N.W.2d at 
636-37 (footnotes omitted). We agree that both public and private entities 
suffer similar hardships when forced to refund agreed-upon late fees received 
without protest, relied upon, and used in the ordinary course of business, and 
reject Peake’s contention that the voluntary-payment rule applies only in suits 
to recover money paid to the sovereign. 
            Peake 
also claims this is a “run-of-the-mill” breach-of-contract case to which the 
voluntary-payment rule should not apply. It is true that, to the extent the 
subject matter of Peake’s claims is covered by the parties’ contract, the rule 
would not apply. But insofar as Peake alleges an illegal penalty has been 
assessed, which would operate to void the contractual late-fee payment 
obligation, his refund suit sounds in restitution for unjust enrichment. 

            Peake 
argues that if it is determined he had full knowledge of all the facts, 
companies like BMG will be allowed to charge illegal fees to their customers 
without consequence. The plaintiffs in Putnam made a similar argument; 
they asked the Wisconsin court to create an additional exception to the 
voluntary-payment doctrine, one in which the doctrine would not apply when a 
private entity engaged in wrongful conduct or charged illegal liquidated 
damages. Putnam, 649 N.W.2d at 634. The Wisconsin court declined, 
however, to create a new exception to the rule, noting that the state’s current 
exceptions sufficiently reinforced the public policy and equitable concerns 
behind the rule. Id. The court observed: “A claim of unlawful liquidated 
damages is not sufficiently similar to claims of fraud or duress, or mistake of 
material fact, to join them as exceptions to the voluntary payment doctrine.” 
Id. at 635. According to the court, “[a]llegations of fraud, duress, and 
mistake each work to negate the true voluntariness of payments,” whereas the 
“wrongdoing of unlawful liquidated damages may be technical in nature.” 
Id. 
            We 
agree with Putnam; a claim that a late fee constitutes an unlawful 
penalty is not tantamount to a claim of fraud, duress, or coercion. In this 
case, the late fees were a set amount per month, and there is no allegation of 
mistake or fraud as to their calculation. Even the Draft Restatement that the 
Indiana Supreme Court followed recognizes that, in circumstances like these, 
contracts between parties should be enforced:
A transfer pursuant to a valid 
agreement of the parties cannot be nonconsensual, nor can it result in the 
unjustified enrichment of the recipient. The basis of a claim under this section 
to recover a payment of money not due disappears if the payment in question was 
made pursuant to a valid agreement of the parties allocating between them the 
risk of a perceived uncertainty as to the underlying obligation. If the party 
making payment has assumed the risk that relevant facts are other than supposed, 
the payment does not become involuntary because a divergence between expectation 
and realization is later detected.
Restatement (Third) of Restitution & Unjust 
Enrichment § 6 cmt. d (Tentative Draft No. 1, 2001) (citation omitted). 
Liquidated damages in the form of late fees generally fit well within this 
paradigm because the costs resulting from untimely payments, while presumably 
relatively small, are real and are difficult, if not impossible, to calculate 
precisely. And as we have said, parties regularly use late-fee agreements to 
allocate the risk of uncertainty regarding the damages a company will incur due 
to late customer payments. That the quantified uncertainty might later prove to 
be an inaccurate or unreasonable approximation of damages actually caused by 
customers’ late payments does not make the charge fraudulent or coercive for 
purposes of precluding the voluntary-payment rule’s application.
            Nor 
does an unlawful-penalty allegation implicate duress under the circumstances 
presented here. The class does not suggest they have no alternative means of 
obtaining compact discs or could not choose to contract with other companies if 
they thought the late fees BMG charged were unreasonable or unenforceable; in 
fact, in this case Peake testified that he belonged to a competitor compact disc 
club that did not charge him late fees. 

 Thus, we see no fraud, 
duress, or coercion in requiring parties who contract for late fees to speak up 
at the time of or prior to payment and attempt to resolve any dispute before 
resorting to the courts at some later time.
            Certainly, 
the traditional fraud, duress, deception, and coercion exceptions to the 
voluntary-payment rule still apply in circumstances to which the rule itself 
does, and whether or not a consumer had full knowledge of all the facts in any 
given case will depend upon the specific circumstances presented. Additional 
exceptions would bar the rule’s application when statutory or other legal 
doctrines require. 

 Moreover, the 
voluntary-payment rule is an equitable one and may require balancing competing 
interests depending upon the parties’ circumstances. We believe, however, that 
even though the rule’s relevancy has receded in light of the current state of 
our jurisprudence, the voluntary-payment defense applies to the illegal-penalty 
allegation and refund request in this case. We now turn to the issue of class 
certification. 
V. 
Class Certification BMG argues that application of the voluntary-payment 
rule to this case necessarily means individual issues will predominate and 
defeats class certification. BMG concedes that the “full knowledge” issue is 
susceptible to resolution on a class-wide basis because all purported class 
members relied upon the same information. According to BMG, however, resolving 
issues of fraud, deception, duress, and coercion, which would preclude the 
rule’s application, will “require discovery of hundreds of thousands of current 
and former BMG Direct club members and would result in countless ‘mini-trials.’” 
We acknowledge that this prong of the voluntary-payment rule presents the 
thornier issue. 
            In 
Southwestern Refining Co. v. Bernal, we rejected the “certify now 
and worry later” approach to class certification that many Texas courts had 
applied. 22 S.W.3d 425, 435 (Tex. 2000). Instead, we required courts to “perform 
a ‘rigorous analysis’ before ruling on class certification to determine whether 
all prerequisites to certification have been met.” Id. We further 
explained:
[I]t is improper to certify a 
class without knowing how the claims can and will likely be tried. See 
Castano v. American Tobacco Co., 84 F.3d 734, 744 (5th Cir. 1996). A trial 
court’s certification order must indicate how the claims will likely be tried so 
that conformance with Rule 42 can be meaningfully evaluated. 
 Bernal, 22 S.W.3d at 
435 (citation omitted).
            The 
trial court certified this class action under Rule 42(b)(3), 

 which requires common 
questions of law or fact to predominate over individual ones and that class 
treatment be “superior to other available methods for the fair and efficient 
adjudication of the controversy.” Tex. R. 
Civ. P. 42(b)(3). The predominance requirement’s purpose is “to prevent 
class action litigation when the sheer complexity and diversity of the 
individual issues would overwhelm or confuse a jury or severely compromise a 
party’s ability to present viable claims or defenses.” Bernal, 22 S.W.3d 
at 434. When addressing predominance, the court should specifically look to 
“‘whether common or individual issues will be the object of most of the efforts 
of the litigants and the court.’” Id. (quoting Cent. Power & Light 
Co. v. City of San Juan, 962 S.W.2d 602, 610 (Tex. App.—Corpus Christi 1998, 
pet. dism’d w.o.j.)). Importantly, courts must identify the substantive issues 
that will control the litigation in order to discern which issues will 
predominate. Id. 
            In 
this case, the trial court did not decide whether the voluntary-payment rule 
would apply, asserting only that its application was “unlikely.” Even if the 
rule did apply, the court opined, the “issue is not individual and may be 
determined as another common issue on a class wide basis.” The order says 
nothing about how the voluntary-payment rule and the issues involved in its 
application could be tried class wide were the court to determine that the rule 
did apply, nor does it consider obstacles to class certification that the rule’s 
application might present. For example, the evidence indicates that BMG 
sometimes did not charge all of the late fees (once charging Peake only $2.85 
for $110 worth of CDs he paid for eight months late), and that customers could 
return any unwanted discs. As we have said, the voluntary-payment rule is an 
important substantive issue that could have a significant effect on the way the 
claims in this case are tried. The trial court failed to “rigorous[ly] analyze” 
the voluntary-payment rule’s effect on the requirements for class certification. 
See U-Haul Co. of Ala., Inc. v. Johnson, 2004 WL 1079804 (Ala. 2004) 
(vacating a class-certification order and remanding because “the trial court 
exceeded its discretion in certifying a class without addressing the question of 
the effect upon its certification of the U-Haul defendants’ voluntary-payment 
defense”). 
            We 
have said that a trial plan is required in every class-certification order “to 
allow reviewing courts to assure that all requirements for certification 
under Rule 42 have been satisfied.” State Farm v. Lopez, 156 S.W.3d 550, 
556 (Tex. 2004). “The formulation of a trial plan assures that a trial 
court has fulfilled its obligation to rigorously analyze all certification 
prerequisites and ‘understand[s] the claims, defenses, relevant facts, and 
applicable substantive law in order to make a meaningful determination of the 
certification issues.’” Id. (quoting Bernal, 22 S.W.3d at 435) 
(quoting Castano, 84 F.3d at 744)). Because the trial court did not 
examine the obstacles to class certification the voluntary-payment defense might 
present, the trial plan in this case lacks the analysis necessary to assure that 
this class meets the prerequisites for certification under Rule 
42(b)(3).
            We 
note that several courts have determined that application of the 
voluntary-payment rule causes individual issues to predominate and therefore 
precludes class certification. See Salvaggio, 709 S.W.2d at 308 
(where taxpayers sought recovery of attorney fee charges paid in connection with 
penalty and interest charges for delinquent taxes, the trial court did not abuse 
its discretion in refusing to certify a class based on the voluntary-payment 
rule’s application); Smart Prof’l Photocopy Corp. v. Childers-Sims, 850 
So. 2d 1245, 1251-52 (Ala. 2002) (vacating a class-certification order because 
inquiries into whether consumers made a mistake of fact would cause individual 
issues to predominate); Solomon v. Bell Atl. Corp., 777 N.Y.S.2d 50, 
54-55 (N.Y. App. Div. 2004) (decertifying a class in part because of individual 
issues raised by voluntary-payment defense); but see Sutton Steel & 
Supply, Inc. v. BellSouth Mobility, Inc., 875 So. 2d 1062, 1070 (La. Ct. 
App. 2004) (holding that class decertification was not necessary because the 
voluntary-payment rule is an affirmative defense and although “affirmative 
defenses may limit or bar a class member’s ultimate recovery, they will not 
affect the initial determination of [the defendant’s] liability”). As decisions 
from these courts indicate, the voluntary-payment rule may well involve some 
individualized inquiry. But we decline to hold that a class can never be 
certified when a defendant has asserted the voluntary-payment defense; in many 
cases it would be unfair to allow a defendant to preclude class certification 
simply by alleging an affirmative defense. 
            The 
parties in this case, both here and in the class-certification proceeding, have 
directed their focus on whether the voluntary-payment doctrine’s full-knowledge 
requirement has been met, and we have determined that it has. Moreover, we have 
said that the classmembers’ unlawful-penalty allegation, under the circumstances 
presented here, does not implicate the type of fraud, duress, or coercion that 
would preclude the voluntary-payment defense. We cannot tell from the record, 
though, whether the plaintiffs contend that their payment of the late fees was 
involuntary for reasons other than the allegedly penal nature of the fees. 
Accordingly, remand to the trial court is appropriate so that it may determine 
the effect of BMG’s voluntary-payment defense on the requirements for class 
certification. If the trial court determines that common issues will predominate 
in resolving the voluntary-payment defense, then the court should explain why 
and describe how the voluntary-payment issues will be tried.
VI. Conclusion
            For 
the foregoing reasons, we decertify the class that the trial court certified and 
remand the case to the trial court for proceedings consistent with this opinion. 

 
__________________________________________
Harriet O’Neill
Justice
OPINION DELIVERED: November 18, 
2005.